**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| GEORGE GOULD,<br><br>Plaintiff,<br><br>v.<br><br>The CITY OF NEW HAVEN, BRIAN SULLIVAN, KEITH WORTZ, LEE DEASE, Personal Representative of the Estate of Leroy Dease, JOHN CARANGELO, Personal Representative of the Estate of Percy Gethers, DANIEL GLEASON, GIL BURTON, STEPHEN COPPOLA, MATTHEW MERCED, OTHONIEL REYES, in their individual capacities, and JOHN AND JANE DOES.<br><br>Defendants. | **Case No. 3:25-cv-934**<br><br>**FOURTH AMENDED COMPLAINT AND JURY DEMAND** |

Plaintiff George Gould by and through his attorneys, Neufeld Scheck Brustin Hoffmann & Freudenberger, LLP, and the Law Offices of Richard Emanuel, states as follows:

## INTRODUCTION

**1.** Beginning in 1993, and continuing for an initial period of almost seventeen years and a subsequent period of almost ten years, Plaintiff George Gould was wrongfully imprisoned for a robbery and murder that he did not commit; even after he was finally released in 2021, Mr. Gould's wrongful conviction was maintained for an additional three years before he was finally exonerated in 2024. Although he was absolutely innocent, Mr. Gould was arrested, convicted and imprisoned on the basis of false evidence from a drug-addicted witness that was coerced and fabricated by detectives and supervisors of the New Haven Police Department ("NHPD"). Mr. Gould's wrongful incarceration was caused and prolonged by the City of New Haven, the NHPD

and other Defendants' intentional, deliberately indifferent and/or negligent failure to disclose exculpatory and impeachment evidence, on an ongoing basis for years, in violation of Plaintiff's civil rights under the U.S. and Connecticut constitutions, Conn. Gen. Stat. § 54-86c(c) and the common law. As further set forth below, the wrongful acts of the NHPD, and its investigative and supervisory personnel, proximately caused Mr. Gould to suffer severe and continuing personal injury, bodily injury, pain, suffering, physical and emotional distress, and restrictions on all forms of personal freedom on a daily basis for three decades, specifically including part of 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2020, 2021, 2022, 2023, and 2024, and further including the ongoing effects thereof to this day.

**2.** Mr. Gould at all times steadfastly maintained his innocence.

**3.** After Mr. Gould was convicted, the State's key witness repeatedly disavowed her inculpatory account and stated under oath and to the FBI that NHPD Detectives had improperly coerced and fabricated her statements and photo selections implicating Mr. Gould and his co-defendant, Ronald Taylor. Additionally, the City's police department, and other Defendants herein, failed to intervene, disclose or rectify their foregoing wrongful acts and omissions that continued during the above-listed years from 1993 to 2024, in violation of Mr. Gould's civil rights.

**4.** In May 2021, after his motion for sentence modification was granted, Mr. Gould was finally released from prison after serving more than 26 years for a crime he did not commit. In March 2022, his conviction was reviewed by the Conviction Integrity Unit ("CIU") of the Connecticut Office of the Chief State's Attorney. Following the CIU review, the New Haven State's Attorney filed a motion to set aside Mr. Gould's criminal conviction on the grounds that

"the totality of the information developed to date, and presently available, has sufficiently undermined the State's confidence in the judgment of conviction."

**5.** The State's motion to vacate was granted on February 1, 2024, and at the request of Mr. Gould's defense counsel, his charges dismissed.

## JURISDICTION AND VENUE

**6.** This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Mr. Gould's civil rights as secured by the United States Constitution. This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

**7.** This Court has supplemental jurisdiction over Mr. Gould's state civil rights and other state law claims pursuant to 28 U.S.C. § 1367(a).

**8.** Venue is proper in the District of Connecticut under 28 U.S.C. § 1391(b), in that this is the District in which the claim arose.

## JURY DEMAND

**9.** Plaintiff respectfully demands a trial by jury on all issues and claims set forth in this Complaint, pursuant to the Seventh Amendment of the United States Constitution and Federal Rule of Civil Procedure 38(b).

## PARTIES

**10.** Plaintiff **GEORGE GOULD** is a resident of the State of South Carolina, and, as relevant to this Complaint, was previously a resident of the Fair Haven section of New Haven, Connecticut, where he had resided since grade school.

**11.** Defendant **CITY OF NEW HAVEN** is, and at all times relevant to this Complaint was, a municipality located in the State of Connecticut. The City of New Haven was officially responsible for the policies, practices, and customs of the NHPD, and was the employer of the

individual NHPD Defendants in this matter. During all times relevant to this Complaint, the City of New Haven delegated policy-making authority regarding the NHPD to the NHPD Chief of Police, for whose actions the City itself was directly liable.

**12.** Defendant **BRIAN SULLIVAN,** as relevant to this Complaint, was an officer of the NHPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New Haven and the NHPD. Defendant Sullivan is named in his individual capacity.

**13.** Defendant **KEITH WORTZ,** as relevant to this Complaint, was an officer of the NHPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New Haven and the NHPD. Defendant Wortz is named in his individual capacity.

**14.** Defendant **LEE DEASE, Personal Representative of the Estate of LEROY DEASE,** is the personal representative of the Estate of Leroy Dease who as relevant to this Complaint, was an officer of the NHPD acting under color of law and within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New Haven and the NHPD. Defendant Lee Dease, Personal Representative of the Estate of Leroy Dease, is named in relation to Dease's individual capacity.

**15.** Defendant **JOHN CARANGELO, Personal Representative of the Estate of PERCY GETHERS**, as relevant to this Complaint, was an officer of the NHPD acting under color of law and within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New Haven and the NHPD. Defendant John Carangelo, Personal Representative of the Estate of Percy Gethers, is named in relation to Gethers's individual capacity.

**16.** Defendant **DANIEL GLEASON**, as relevant to this Complaint, was an officer of the NHPD acting under color of law and within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New Haven and the NHPD. Defendant Gleason is named in his individual capacity.

**17.** Defendant **GIL BURTON**, as relevant to this Complaint, was an officer of the NHPD acting under color of law and within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New Haven and the NHPD. Defendant Burton is named in his individual capacity.

**18.** Defendant **STEPHEN COPPOLA**, as relevant to this Complaint, was an officer of the NHPD acting under color of law and within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New Haven and the NHPD. Defendant Coppola is named in his individual capacity. Coppola later became an investigator for the State of Connecticut.

**19.** Defendant **MATTHEW MERCED**, as relevant to this Complaint, was an officer of the NHPD acting under color of law and within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New Haven and the NHPD. Defendant Merced is named in his individual capacity.

**20.** Defendant **OTHONIEL REYES**, as relevant to this Complaint, was an officer of the NHPD acting under color of law and within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New Haven and the NHPD. Defendant Reyes is named in his individual capacity.

## FACTUAL ALLEGATIONS

### Mr. Gould had no involvement in the murder of Eugenio Vega.

**21.** On July 4, 1993, at approximately 5:35 a.m., Mr. Eugenio Vega was shot and killed in his bodega, *La Casa Green II*, located at 330 Grand Avenue, New Haven, Connecticut.

**22.** Mr. Vega's murder was planned and orchestrated by his son, Carlos DeLeon, over money. Carlos DeLeon has confessed to his father's murder to family members over the years. At least two family members reported those admissions to the FBI.

**23.** Responding to a 911 call, NHPD found Mr. Vega in his walk-in cooler, in a pool of blood, with his wrists bound, and a single gunshot wound to the head. Though the floor safe was open and the victim's wallet was empty, Mr. Vega was found with nearly $2,000 in cash in his front pocket. The store's cash register also still contained additional cash.

**24.** Plaintiff George Gould had no personal relationship with Mr. Vega and absolutely no involvement with the homicide. Mr. Gould's only knowledge of Mr. Vega was having purchased items from him at a different bodega.

**25.** No physical evidence ever connected Mr. Gould to the crime. None of the fingerprints lifted from the scene matched Mr. Gould or his co-defendant Ronald Taylor, nor was there any DNA, trace evidence, or even any indication that Mr. Gould or Mr. Taylor had ever been in possession of any items that might have been taken from the store.

**26.** Police were never able to connect George Gould or Ronald Taylor to any item of evidence taken from *La Casa Green II*, the crime scene.

**27.** Police lifted identifiable prints from the edge of Mr. Vega's open safe, in an area that could only be touched when the safe was open. Mr. Taylor and Mr. Gould were excluded as the sources of those prints.

**28.** NHPD also had no eyewitness statements pointing to any culprit until three weeks later, when Doreen Stiles, a known heroin addict, was arrested for soliciting prostitution and brought

to the NHPD for questioning. After hours of interrogation, intimidation, and coercion, NHPD obtained false police statements and identifications from Stiles implicating the innocent Mr. Gould, and his innocent eventual co-defendant, Ronald Taylor.

**Defendants fabricate evidence to build a false case against Mr. Gould, who they had targeted previously in unrelated cases, and Mr. Taylor, who had been with Mr. Gould the night before Vega was murdered.**

**29.** New Haven Police Department Officer Defendant Keith Wortz responded to the scene shortly after 6 a.m. the morning of the murder.

**30.** Defendant Wortz made observations at the scene and found Mr. Vega's body in the store's walk-in freezer. Wortz noted that Mr. Vega had a single gunshot wound to the head, and that his body was still warm to the touch.

**31.** Crime scene detectives arrived and noted, among other things that the way the victim's hands were bound indicated that at least two people were responsible. Although the safe was open, the cash register was unlocked and had over $100 in bills and coins in it, and the victim had a large roll of bills in his pocket totaling $1,810. Officers also located a spent .380 shell casing near the victim's right elbow, indicating he had been shot while in the cooler. A single bullet was located in a block of cheese in the freezer.

**32.** Several other NHPD officers responded to the scene, including Defendant Sullivan, who directed the investigation. A crowd of civilians also gathered across the street from the scene.

**33.** Detectives interviewed Tasha Williams, a.k.a. Natasha Grooms/Groomes, who lived across the street from *La Casa Green II*. Williams reported that prior to the murder a white man approached her and asked her where he could cash lottery tickets; she then saw him walk up to the store. Officers tracked the man down, classified him as a suspect, and brought him to the Investigative Services Unit ("ISU") at NHPD Headquarters for questioning. Defendants Dease and Sullivan interviewed him pursuant to *Miranda v. Arizona*, took prints, and confiscated

evidence, including his clothing, but were unable to obtain any admissions.

**34.** Ms. Williams also reported that she had seen a white woman open the front door of *La Casa Green II*, call for the owner, and then run away screaming. Officers subsequently determined that the woman who entered the store was in fact Mary Boyd, a Black woman. According to Williams, after the murder Boyd told Ms. Williams not to mention her name.

**35.** At the same time that they initially interviewed Ms. Williams, Detectives spoke with Mr. Gould, who was outside Ms. Williams's apartment building across the street from the crime scene. Mr. Gould, who was staying with Ms. Williams at the time, reported truthfully that he had spent the evening and early morning around the corner from Ms. Williams's building partying with friends, including Mr. Taylor.

**36.** Mr. Gould was known to NHPD officers, in particular to Defendant Gleason. Gleason had arrested Gould as a teenager, on at least one occasion striking him in the head with a flashlight. On another occasion Gleason went to strike Gould with a nightstick; Gould, who was handcuffed, blocked the blow and Gleason fell to the ground; Gould kicked him. On a third occasion Gleason falsely accused Gould of a robbery and threatened Gould that he was going to "get" him.

**37.** On July 7, Defendants Dease and Burton questioned their suspect from the morning of the murder (the white man Boyd said she saw walk up to the store before the murder) a second time at the ISU. They again failed to obtain any admissions.

**38.** After failing to develop evidence implicating their initial suspect, and with no other obvious viable suspects, the defendants turned their focus to building a false case against the man Defendant Gleason had sworn to take down, Mr. Gould, and the man identified as Mr. Gould's companion from the evening leading up to the murder, Mr. Taylor.

***Fabricated Statement of Mary Boyd***

**39.** Defendants Dease and Burton first interviewed potential witness Mary Boyd the day of the murder. Boyd initially reported that she went past the store early that morning and only saw Vega there; she then stopped inside the store to buy toilet paper on her way home, got nervous when she couldn't locate Vega, and left.

**40.** On July 8, Defendants Dease and Burton brought Mary Boyd to the ISU. They held her against her will and interrogated her for hours off-tape. At the time, Boyd had open warrants and was on probation.

**41.** During that lengthy unrecorded interrogation, Defendants, including at least Dease and Burton, threatened Boyd with arrest for Vega's murder and a lengthy jail sentence unless she would say she had seen two Black males in the store the morning of Vega's murder. The defendants only permitted her to leave after she adopted this false story.

**42.** Defendants, including at least Dease and Burton, tape recorded Boyd's statement in Q & A format, making it falsely appear that she had volunteered her account of seeing the two Black males without any pressure or suggestion. The defendants omitted the misconduct they used to obtain Boyd's false statement from their reports.

***Fabricated Statement of Doreen Stiles***

**43.** Defendants next turned to Doreen Stiles, a white woman who supported her heroin addiction with sex work in the Fair Haven neighborhood and who was known to the defendant officers, at least including Defendants Wortz and Gleason. The defendant officers, at least including Defendant Gleason, had used Stiles for information in other cases before. By July 1993 Stiles had been addicted to heroin for about ten years and used approximately 10 bags of heroin a day.

**44.** Defendant Wortz knew Stiles as a drug addict and sex worker in the neighborhood, and knew she was vulnerable due to her addiction and could be pressured into giving a false statement. Wortz suggested to Defendant Sullivan that they seek evidence regarding the Vega homicide from Stiles. Wortz had no reason to believe Stiles had any knowledge of the crime. Defendant Wortz talked with Stiles on the street on multiple occasions during the month of July and asked about the Vega murder, and Stiles repeatedly told Wortz she knew nothing about the crime.

**45.** On July 29, an undercover officer posing as a John picked Stiles up on the street in Fair Haven. The officer pulled into a parking lot where a number of NHPD cruisers and officers waited. Stiles was given the choice of going straight to lock-up or answering questions at the ISU.

**46.** At the ISU, Defendant Sullivan interrogated Stiles off-tape for hours, assisted by Defendants Dease, Gethers, and Gleason. Stiles was exhibiting visible symptoms of heroin withdrawal, including cramps and shivering. It was evident to Sullivan that Stiles, a very serious drug addict who had just been arrested for prostitution and appeared to care most about getting more drugs, had serious credibility and reliability problems. Although Defendants understood that those issues had to be documented, they intentionally omitted Stiles's drug addiction, withdrawal symptoms, and other indicia of credibility problems from their written reports.

**47.** Stiles repeatedly denied any knowledge of the murder, but Defendants refused to accept her truthful denials.

**48.** For hours, Defendants Sullivan, Dease, Gethers, and Gleason insisted that Stiles had been at the scene of the crime, falsely telling her they had a witness who placed her there. These Defendants threatened to lock Stiles up if she didn't adopt their account. Eventually, these

Defendants informed Stiles—who was experiencing severe symptoms of heroin withdrawal—that she could not leave until she adopted their account, and that they would take her to buy heroin when she did.

**49.** At the time of this investigation Defendant Sullivan had a practice of telling witnesses that if they told him what he wanted to hear he would take them to procure drugs, even though he understood it could cause witnesses to provide false information.

**50.** It was also Sullivan's regular practice to omit exculpatory information about witnesses, such as a witness's inconsistent statements and factors impacting a witness's credibility, from police reports.

**51.** Although Stiles knew nothing about the murder and repeatedly told Defendants Sullivan, Dease, Gethers, and Gleason that, after hours of accusatory interrogation while she was seriously ill in heroin withdrawal, and after being bribed with the promise of being taken to buy heroin, Stiles acquiesced. Defendants Sullivan, Dease, Gethers, and Gleason provided Stiles with details about the crime and told Stiles what to say to implicate Gould and Taylor. These Defendants then took an audio-recorded statement in Q & A format, falsely making it appear that Stiles was volunteering reliable information about the crime.

**52.** The taped statement indicated that Stiles was present outside the bodega at the time of the murder, that she saw a Black man walking toward the bodega looking "mean," and overheard an argument in which two Black males from the neighborhood were demanding Vega open the safe before firing one shot. Although Stiles did not know George Gould or Ronald Taylor, and hadn't seen them at the crime scene that morning, the taped statement included a description that fit Gould and Taylor. Stiles also indicated that in the moments leading up to the crime she saw two females walk by the store. All of these details originated with the police, not with Stiles.

**53.** Defendants Sullivan, Dease, Gethers, and Gleason also used improper suggestion and/or other impermissible tactics to induce Stiles to falsely identify Mr. Gould's photograph as one of the men she had seen, despite knowing she had not been at the crime scene and had not seen Mr. Gould there.

**54.** When Stiles was eventually released from questioning, Defendants kept their promise to help her buy heroin. Stiles left NHPD headquarters with Defendants Sullivan and Gleason, who then drove Stiles in an unmarked vehicle to a local area where drugs were sold. Defendant Sullivan provided Stiles with money to buy heroin. Stiles immediately purchased three bags of heroin using the money provided by Defendant Sullivan, returned to the unmarked vehicle, and was driven home by Defendants Sullivan and Gleason.

**55.** Defendants Sullivan, Dease, Gethers, Gleason, and Wortz omitted the misconduct described above and the other exculpatory information about Stiles, including that she was under arrest for prostitution and that she was experiencing heroin withdrawal while being interrogated and giving her statement, from their written and oral reports.

**56.** These Defendants subsequently misrepresented in the false "Q & A" statement, their written reports, and their oral reports to the prosecution, that Stiles had voluntarily provided information that she knew about the crime without suggestion or coercion and that she had identified Gould from a proper identification procedure without police suggestion.

**57.** Days later, Defendants Dease and Gethers conducted a second interview with Stiles. They again used improper suggestion, coercion and/or other impermissible tactics to induce Stiles to falsely identify a photograph of Ronald Taylor as the second subject.

**58.** During the same interaction, Defendants Dease and Gethers used improper suggestion and/or other impermissible tactics to induce Stiles to identify Mary Boyd as an individual she

saw outside the bodega, when in fact Stiles was not present at the time of the incident and did not see Ms. Boyd, whom she knew.

**59.** Defendants Dease and Gethers then took a taped statement in "Q & A" format that wrongly made it appear Stiles had identified Taylor without threats of suggestion and that the details about seeing Mary Boyd at the scene had originated with her and not with the Defendant officers.

**60.** As with the previous statement, Defendants Dease and Gethers misrepresented the circumstances of this interaction to the prosecution in oral and written reports. Specifically, these Defendants documented that Stiles had volunteered information only someone present at the crime scene that morning would know.

**61.** In fact, Stiles never had any truthful information tying Gould or Taylor to the murder, and Stiles never witnessed any of the inculpatory events described in her statement.

**62.** Defendants Sullivan, Dease, Gethers, Gleason, and Wortz never informed prosecutors that Stiles repeatedly denied having any knowledge of the crime, or that Defendants coerced Stiles and fed her the information she recited on tape. Nor did they inform prosecutors that Stiles was addicted to heroin, suffering from withdrawal at the time of at least one of her statements, and taken to purchase heroin with money Sullivan provided in return for her false account. Instead, Defendants withheld the facts of their suggestion, fabrication, coercion and threats from the prosecution and defense.

**63.** Sullivan also told other officers in the NHPD not to bother Stiles, and told Stiles that if other officers tried to stop or arrest her she should say she worked for Sullivan and they would leave her alone.

**64.** At one point, Defendant Coppola tried to arrest Stiles and Sullivan personally

intervened; she was let go. Neither Coppola, Sullivan, nor any other officers documented those interactions or Sullivan's promises to Stiles.

**65.** Defendants also fabricated in their narrative police reports that they had already developed strong evidence of George Gould's and Ronald Taylor's involvement before they interviewed Stiles.

***Fabricated Statement of Pamela Youmans***

**66.** Defendants Dease and Burton interviewed Pamela Youmans twice in the days immediately following the murder. She reported that she had been outside and inside the store just prior to the murders. She did not mention anything during her initial two interviews about seeing a white woman.

**67.** Defendants Dease and Gethers reinterviewed Youmans on August 3. These defendants used suggestion or other improper tactics to induce Youmans to falsely state that she had seen Doreen Stiles outside the bodega on the morning of the murder. These Defendants misrepresented their interactions with Youmans to make her account appear reliable.

**Mr. Gould and Mr. Taylor are wrongfully arrested, prosecuted, and convicted for Vega's murder.**

**68.** On August 12, 1993, based primarily on Doreen Stiles's police-fabricated witness statement, New Haven Police obtained an arrest warrant for Mr. Gould and Mr. Taylor charging them with the murder of Eugenio Vega. Mr. Gould was arrested the same day.

**69.** A probable cause hearing was held on October 14, 1993. Doreen Stiles served as the State's primary witness and repeated the fabricated statements attributed to her by Defendants.

**70.** Prior to the probable cause hearing, Defendants Sullivan and Gleason took Stiles and her boyfriend to a restaurant and a hotel, which Defendants paid for. Defendant Sullivan also took Stiles to her drug suppliers and gave her money to buy heroin. Defendants told Stiles she was not

free to go home and had to remain in the hotel for the night.

**71.** Defendant Sullivan sat in the hotel room all night while Stiles and her boyfriend took turns shooting the heroin Sullivan had paid for. Defendant Gleason guarded the door.

**72.** As a result of Stiles's fabricated and coerced testimony at the hearing, Mr. Gould and Mr. Taylor were formally charged with murder in violation of Gen. Stat. §§ 53a-8 and 53a-54a; felony murder in violation of Gen. Stat. § 53a-134(a)(2); robbery in the first degree in violation of Gen. Stat. §§ 53a-8 and 53a-134(a)(2); attempt to commit robbery in the first degree in violation of Gen. Stat. §§ 53a-8, 53a-49, and 53a-134(a)(2); and conspiracy to commit robbery in the first degree in violation of Gen. Stat. §§ 53a-48 and 53a-134(a)(2).

**73.** Prosecutors at the New Haven State's Attorney's Office did not know about the NHPD's misconduct to this point. In addition to their coercive interrogation practices which resulted in fabricated statements and identifications, Defendants also coerced Doreen Stiles's probable cause hearing testimony.

**74.** In January 1995, Mr. Gould and Mr. Taylor were jointly tried before a jury. The only direct evidence presented against them was Stiles's testimony, which was videotaped at the hospital where she was being treated for a heart infection and played for the jury. Given their innocence, no other eyewitness identified Gould or Taylor as having been at the scene, and no physical or forensic evidence tied either man to the crime. In other words, the state's case wholly relied on Doreen Stiles's fabricated and coerced testimony. The trial prosecutor argued to the jury in summation, "This case rises and falls on the testimony of Doreen Stiles."

**75.** On the basis of that testimony, Mr. Gould and Mr. Taylor were found guilty of felony murder, robbery, attempted robbery, and conspiracy to commit robbery and were unjustly sentenced to eighty years imprisonment for crimes they did not commit.

**<u>At Mr. Gould and Mr. Taylor's first *habeas* hearing, Doreen Stiles and Mary Boyd admit their trial testimony was false and coerced.</u>**

**76.** After exhausting their direct appeals, Gould and Talor each filed petitions for a writ of habeas corpus. The petitions were heard at a joint habeas trial in 2009 and 2010. Doreen Stiles testified that she was not in fact at *La Casa Green II* on the morning of July 4, 1993, and that her statements to police and her 1995 criminal trial testimony were false.

**77.** This time, Stiles gave accurate testimony about her heroin addiction and her encounters with police in July and August 1993, including that she denied being at the scene or having any knowledge of the crime repeatedly to them, that police insisted she was there and threatened to lock her up, that she was suffering from serious and obvious withdrawal symptoms for hours at the ISU, and that police told her she could not leave until she adopted their account and they would take her to buy heroin once she did.

**78.** Stiles also testified to the suggestive photo showings and to Sullivan giving her money to buy heroin on two occasions: once at the end of the interrogation and once the night before the probable cause hearing.

**79.** Mary Boyd also testified and stated that the statements in her police interview and at the criminal trial indicating that she had seen two men of color in *La Casa Green II* on the morning of the crime were false.

**80.** On March 17, 2010, the habeas court issued a 95-page decision granting habeas relief to Gould and Taylor on grounds of actual innocence. They were released from custody on appeal bonds on April 1, 2010.

**<u>Defendants coerce another false, inculpatory statement from Stiles and intimidate her from testifying truthfully at a second *habeas* hearing, resulting in the resumption of Mr. Gould and Mr. Taylor's wrongful convictions, and the reincarceration of Mr. Gould.</u>**

**81.** The State appealed and the Connecticut Supreme Court reversed and remanded on the

grounds that while "the recantations by Stiles and Boyd may demonstrate that there no longer is any credible evidence that the petitioners did commit the crimes" the Court had mistakenly applied the actual innocence standard.

**82.** On August 8, 2011, Mr. Gould was returned to custody. At the time, Mr. Taylor was receiving hospice care for colon cancer he developed while in prison and was permitted to remain at home. He died later that year.

**83.** Prior to the second *habeas* trial, Defendant Coppola and another state investigator went to Stiles's New Haven apartment and brought her to the NHPD Detective Division. Stiles was interviewed by Defendants Reyes and Merced under the supervision of Coppola and the other state investigator. Defendants used impermissible pressure and/or other improper tactics to induce Stiles to state that her *habeas* testimony was false and the result of pressure from a defense investigator on the *habeas* team.

**84.** Sixteen days later Defendant Coppola and the other state investigator returned to Stiles's apartment and pressured her to sign a written transcription indicating that her testimony at the original criminal trial was the truth. Stiles refused.

**85.** Mr. Gould's second *habeas* trial was held in 2012 before a different judge. Although Gould took the stand and truthfully testified to his innocence, unlike at the first, successful *habeas* trial, Doreen Stiles, in fear of testifying truthfully based on Defendants Coppola, Reyes, and Merced having recently pressured and intimidated her not to, invoked her Fifth Amendment Rights. Faced with her videotaped criminal trial testimony without her new truthful testimony the Court concluded that Mr. Gould had failed to demonstrate Stiles lied. The *habeas* petition was denied and Mr. Gould was unsuccessful in his subsequent appeals.

**<u>Mr. Gould's conviction is vacated in 2024 on a motion from the State.</u>**

**86.** On May 4, 2021, Mr. Gould's sentence was modified to 26 years at the request of his

attorneys, and he was released from prison the next day, May 5, 2021.

**87.** Prior to the sentence modification, FBI agents interviewed two of Carlos DeLeon's relatives, who reported that Mr. DeLeon had confessed to them that he had murdered his father after embezzling money from him.

**88.** The FBI also interviewed Doreen Stiles, who provided a truthful account of her interactions with police. The FBI then gave Stiles a polygraph. The polygraph examiner asked if she had seen Gould and Taylor inside the bodega and she responded that she had not. The result of the polygraph examination was "No Deception Indicated."

**89.** Following a review of the case by the Conviction Integrity Unit (CIU) of the Connecticut Division of Criminal Justice, on February 1, 2024, the New Haven State's Attorney asked the Court to set aside Gould's conviction, explaining the information developed had "undermined the State's confidence in the judgment of conviction" so thoroughly as to require such a motion. The judge granted the motion and dismissed the case.

**The NHPD engaged in an unconstitutional pattern, practice, and custom of coercing and fabricating witness statements, and suppressing related exculpatory evidence, throughout the 1990s and into the early 2000s, causing serial wrongful convictions.**

**90.** From the late 1980s and into the early 2000s, the City of New Haven, by and through its final policymakers at the NHPD, had in force and effect a policy and practice of unconstitutional misconduct with respect to the taking and documentation of witness statements that caused serial wrongful arrests and convictions in homicide cases.

**91.** Several ISU detectives and supervisors from the time have admitted under oath that during the 1990s the NHPD ISU followed a practice, known to and approved by supervisors, of non-documentation and suppression of exculpatory evidence from witness statements, including witnesses' inconsistent statements over the course of an interview and factors impacting

witnesses' credibility, such as their being under arrest or in drug withdrawal when interviewed.

**92.** During this 15-plus year period ISU officers also routinely engaged in rampant misconduct with witnesses and hid it. The NHPD had an admitted policy and practice during this timeframe of conducting lengthy, unrecorded, undocumented interviews before turning on an audio tape recorder to record a formal statement. Repeatedly across homicide investigations, ISU officers used illegal tactics such as threats, holding witnesses against their will, physical intimidation, bribes, and feeding information, during those unrecorded interrogations to coerce false statements that were then memorialized in tape recordings that falsely presented the final statement as having been volunteered without coaching, feeding, or coercion. The illegal misconduct used to obtain these false statements, and witnesses' prior statements that contradicted the final recorded statement, were never documented or disclosed.

**93.** The NHPD's efforts to fabricate a case against Mr. Gould and Mr. Taylor for the Vega murder is just one example of this corrupt culture of witness misconduct and suppression of exculpatory evidence. This pattern is reflected across numerous NHPD homicide cases from the late 1980s through the early 2000s that resulted in wrongful arrests, prosecutions, and convictions.

**94.** In 1984, Anthony Golino was wrongly arrested for the 1973 murder of Concetta "Penny" Serra based on false and contradicted witness statements that NHPD ISU homicide detectives fabricated (one witness later testified he would say one thing and police would write down another) and presented in the arrest warrant affidavit as the witnesses' singular version of events, without mention of their contradictory accounts. In 1987, prior to his murder trial, a court-ordered blood test excluded Golino as the perpetrator and the charges were dismissed. In a later civil case, an ISU detective admitted it was his general practice to omit exculpatory

information from affidavits submitted in support of applications for warrants, as he did here.

**95.** In 1991, 18-year-old Eric Ham was wrongly charged and incarcerated for the murder of Markiest Alexander on the basis of fabricated statements coerced from juvenile witnesses by ISU detectives, including through the use of physical intimidation and threats of murder charges and lengthy prison sentences. The detectives told the witnesses exactly what to say in their tape-recorded statements. The affidavit in support of the arrest warrant for Ham included only the incriminating statements from the juveniles and omitted the misconduct used to obtain those statements and the juveniles' inconsistent statements. Ham was arrested and held in custody from February 13, 1991, until May 9, 1991, when his criminal prosecution was *nolled* by the state.

**96.** Before he *nolled* the case against Ham in May 1991, State's Attorney David Gold wrote a comprehensive memo detailing the misconduct and suppression of evidence used in the investigation, warning against the NHPD's omission of exculpatory information in affidavits, recommending a procedure be implemented whereby the entire police file is presented to the State's Attorney Office with the warrant affidavit and application, and recommending the NHPD reopen the investigation. Ham obtained a favorable jury verdict in a civil rights lawsuit against the detectives and was awarded $100,000 in compensatory damages and $800,000 in punitive damages. The NHPD took no action in response to Gold's memo or the jury verdict.

**97.** In 1993, Maceo Streater was wrongfully convicted of the 1990 murder of Terrance Gamble based on fabricated witness statements coerced by ISU homicide detectives through suggestion (including indicating to Streater's photo in a photo array), threats (including in relation to a witness's criminal record), pressure, and telling the witnesses what to say (including stopping and starting the tape recorder to coach them). These statements were presented to the State's Attorney's Office without mention of the illegal misconduct used to obtain them or the

witnesses' inconsistent statements. Streater was falsely imprisoned for over 24 years before being pardoned by the Connecticut Board of Pardons and Paroles in 2022.

**98.** In 1991, James Fleming was wrongly charged in the high-profile murder of Yale student Christian Prince based on a false, fed statement ISU detectives coerced from a juvenile. Detectives interrogated teenager Randy Fleming (no relation) while he was under arrest on unrelated charges and without his mother present and threatened to charge him with the murder unless he repeated back the information they fed to him. The detectives suppressed this misconduct and Randy's inconsistent statements (namely, his insistence he didn't know anything about the crime or the information the detectives fed to him). At Fleming's trial, Randy recanted and testified to the detective's illegal tactics. Fleming was acquitted of all charges related to causing Prince's death.

**99.** In 1994 and 1995 Stefon Morant and Scott Lewis, respectively, were wrongfully convicted of the 1990 double-homicide of Ricardo Turner and Lamont Fields based on fabricated statements coerced by ISU detectives from five different people who knew nothing about the crime. Detectives threatened these individuals they would be charged with the murder and face the death penalty unless they repeated back the information they were fed and stopped and started the tape recorder repeatedly while taking their statements to coach them on what to say. The detectives falsely represented to the prosecution that all the facts on the taped statements were volunteered by the witnesses themselves without coercion or suggestion and suppressed the misconduct used to obtain the statements and the witnesses' inconsistent statements (including off-tape denials they knew nothing about the crime). Lewis won a habeas petition on the basis of the suppressed exculpatory evidence in 2013, and his charges were then dismissed. Morant received an Absolute Pardon from the

Connecticut Board of Pardons and Paroles in 2021.

**100.** In 1995 Adam Carmon was wrongfully convicted of the 1994 murder of seven-month-old infant Danielle Taft and shooting of her grandmother, Charlene Troutman, based on coerced, fabricated statements taken by ISU detectives including Leroy Dease, without the benefit of undisclosed exculpatory information about those statements, including the misconduct used to obtain them and the witnesses' inconsistent statements. Dease and another detective fed specific information to Anthony Stevenson and threatened him with a murder conviction if he did not repeat it back. In a recording of Stevenson's second interview, Stevenson can be heard asking what kind of car Carmon was allegedly driving, Dease can be heard whispering the answer back, and Stevenson can then be heard repeating it. The police report summarizing this interview omits that information was fed and that Stevenson was threatened off-tape. Other exculpatory information, including a written report summarizing an unrecorded statement from Stevenson contradicting his trial testimony and a witness's selection of another individual (not Carmon) as a "look-alike" of the perpetrator in a photo array, was likewise withheld.

**101.** In 1998, Daryl Valentine was wrongfully convicted of the 1991 double murder of Hury Poole and Andrew Paisley after ISU detectives coerced and bribed two witnesses to provide false statements implicating him in the crime and suppressed that misconduct and the witnesses' inconsistent statements. Kristina Higgins and Regina Coleman were at the scene but left before Poole and Paisley were shot and did not see anything. ISU detectives threatened Higgins—then a daily cocaine user with an outstanding warrant for her arrest—with jail time, told her what to say, and gave her alcohol, cigarettes, and money to buy cocaine to get her to repeat it back. ISU detectives told Coleman what to say and promised to pay her as much as she wanted in exchange for her repeating it back, and stopped and started the tape to coach her on what to say. The police

reports omitted mention of this misconduct and of Higgins and Coleman's inconsistent statements. Higgins and Coleman recanted at Valentine's 1994 and 1998 trials and reiterated that their statements were false and coerced in a 2022 investigation by the State's Attorneys' Conviction Integrity Unit. The CIU concluded Valentine's conviction was obtained through "official misconduct and discredited eyewitness evidence."

**102.** In 1999, Vernon Horn and Marquis Jackson were wrongly charged and incarcerated for a 1999 robbery and for the murder of Caprice Hardy on the basis of false, fed witness statements coerced by NHPD detectives including Leroy Dease**,** including by threatening a witness with a parole violation and loss of custody of his children. The police reports omitted any mention of the illegal misconduct used to obtain the statements or the witness's inconsistent statements. In 2018, Horn and Jackson's convictions were vacated.

**103.** In 2006 J'Veil Outing was wrongly charged and incarcerated for the 2005 murder of Kevin Wright on the basis of false, fed witness statements coerced by ISU detectives, including threatening witnesses with jail time and bodily harm and directing them to identify Outing as the perpetrator. The detectives falsely reported the witnesses had identified Outing spontaneously and without suggestion or hesitation.

**104.** In 2007, 16-year-old Bobby Johnson, who has a learning disability, was wrongly charged and convicted for the 2006 murder of Herbert Fields on the basis of false, fed statements coerced from three juveniles by ISU detectives, including through the use of intimidation, lies, and threats. Specifically, detectives threatened the children with the death penalty, never seeing their family again, and were only permitted to leave in exchange for repeating back the information the detectives fed to them.

**105.** In February 2007 Ernest Pagan was wrongly arrested for the 2006 murder of Tony

Howell after ISU detectives pressured and coerced witnesses to identify Pagan as the perpetrator. Pagan was acquitted of all charges in 2008.

**106.** In addition to the misconduct discussed above, prior to this case the Connecticut courts repeatedly documented and criticized the NHPD's long-standing pattern of concealing exculpatory information in connection with witness interviews, including by engaging in misconduct prior to taking a taped witness statement or by destroying a taped statement instead of disclosing the tape to the defense:

**a.** In 1984, in *State v. Myers*, 193 Conn. 457, 467–68, 479 A.2d 199 (1984), the Connecticut Supreme Court determined that "a [tape-recorded] statement of the state's principal witness was deliberately destroyed according to a long-standing policy of the [NHPD], notwithstanding the pendency of serious criminal charges."

**b.** In *State v. Mullings*, 202 Conn. 1, 6, 519 A.2d 58 (1987), NHPD Detective Donna Amato erased the victim's tape-recorded statement and "misplaced" the transcript.

**c.** *State v. Williamson*, 212 Conn. 6, 7, 562 A.2d 470 (1989), presented the Connecticut Supreme Court "with no less than [its] sixth occasion since 1981 to consider whether the New Haven police department's destruction or loss of a witness' statements requires the striking of the witness' testimony in an ensuing criminal trial."

**d.** In *State v. Johnson*, 214 Conn. 161, 164, 571 A.2d 79, 81 (1990), the state Supreme Court again noted that the NHPD had destroyed tape recordings of multiple witnesses.

**e.** Similarly, in *State v. Belle*, 215 Conn. 257, 263-64, 576 A.2d 139 (1990), overruled on other grounds, *State v. Person,* 236 Conn. 342, 352-53, 673, A.2d 463 (1996), the Court found that the NHPD had again destroyed taped statements given by witnesses

to Detective Robert Coffey.

**f.** In *State v. Jones*, 29 Conn. App. 304 (1992), where the state Appellate Court set aside a felony conviction after the NHPD's tape of a police report had been destroyed, the Court noted that the case "necessitate[d] its return, yet again, to the New Haven police department's policy of destruction of taped statements," *Id*. at 310, with one of the Justices pointing out there had been 14 such New Haven cases reaching Connecticut's appellate courts within little more than a decade, and describing the NHPD as one that was "rapidly becoming the bete noire of Connecticut police departments." *Id*. at 335 n.9 (Norcott, J., dissenting in part, concurring in the result). Significantly, the trial judge himself, former New Haven prosecutor Thomas O'Keefe, had taken note of the "apparent . . . temptation" for after-the-fact manipulation of the police record to conform to an officer's subsequent conclusions where, as in *Jones* (as here), the NHPD's pre-existing contemporaneous record (an officer's field notes of a key witness interview) had been destroyed. *Id*. at 310, n.10.

**107.** Despite this repeated explicit warning of recurring *Brady* violations from the Connecticut courts that put NHPD on direct notice of this unconstitutional pattern, NHPD did nothing to change its practice during this time.

## DAMAGES

**108.** The unlawful, intentional, deliberately indifferent, reckless, and/or negligent acts and omissions of the Individual Defendants and the City of New Haven caused George Gould to be falsely arrested and imprisoned, unfairly tried, wrongfully convicted, forced to serve more than 26 years in prison, and forced to live with a wrongful conviction for three decades for a brutal crime he did not commit.

**109.** As a direct result of Defendants' intentional, deliberately indifferent, reckless, and/or negligent acts and omissions, Mr. Gould sustained personal injuries, bodily injuries and damages, including loss of his freedom for more than twenty-six years, loss of his youth, pain and suffering, physical injury, severe mental anguish, emotional distress, indignities and embarrassment, degradation, permanent loss of natural psychological development, and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, travel, enjoyment, and freedom of speech and expression.

**110.** As a further direct result of Defendants' misconduct, while wrongfully incarcerated for more than 26 years for a crime he did not commit, Mr. Gould suffered extensive physical harm and bodily injury associated with the constant physical restraint on his daily movements, lack of access to proper diet and exercise, and repeated, at least daily, unauthorized physical contact from prison officials and physical means of restraint employed by prison officials. As a result of these restraints and this unauthorized physical contact Mr. Gould's physical health persistently deteriorated over the course of his wrongful incarceration and he lives with constant physical and emotional pain.

**111.** As a further result of Defendants' misconduct, Mr. Gould sustained economic injuries and damages, including loss of income and loss of career opportunities

**112.** Further, Mr. Gould was deprived of his familial relationships, including relationships with his four children, his siblings, his wife who he met while out of custody in 2010, and an extended family and network of friends from whom he was cut off for two and a half decades.

## FEDERAL CLAIMS

## COUNT I

**42 U.S.C. § 1983 – Deprivation of Liberty without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence and Withholding Material Exculpatory and Impeachment Evidence under the Fourteenth Amendment**

*Against Defendants Sullivan, Dease, Gethers, Wortz, Gleason, Burton*

**113.** Plaintiff incorporates by reference all of the foregoing paragraphs and further alleges:

**114.** Defendants Sullivan, Dease, Gethers, Wortz, Gleason, and Burton, acting individually and in concert, fabricated false evidence of Mr. Gould's guilt, thereby violating his right to a fair trial and causing him to be deprived of his liberty without due process of law. Defendants caused this false evidence to be used against Mr. Gould in his prosecution and at trial.

**115.** These Defendants fabricated inculpatory information when they used bribery, threats, and other improper tactics to coerce Stiles, Youmans, and Boyd, to repeat back false information the Defendants fed to them, implicating Mr. Gould and Mr. Taylor in the Vega murder. They further fabricated inculpatory information by documenting Stiles, Youmans, and Boyd's statements in ways that made it appear they volunteered all the information without any suggestion or coercion.

**116.** These Defendants suppressed evidence of their misconduct. They failed to disclose the true circumstances of Stiles, Youmans, and Boyd's statements, including that they were subject to threats, bribery, intimidation, and other improper tactics, and that they were held against their will and only permitted to leave when they agreed to repeat false information implicating Mr. Gould and Mr. Taylor that these Defendants fed to them. These Defendants also suppressed Stiles, Youmans, and Boyd's inconsistent statements, including their truthful denials of the circumstances of the Vega murder. These Defendants also suppressed other exculpatory and impeachment information about these witnesses, other information about the misconduct through which their false inculpatory statements were procured and fabricated by these Defendants, and

other information about additional misconduct with these witnesses over time including after Mr. Gould and Mr. Taylor's convictions were first vacated in 2010.

**117.** These Defendants performed the above-described acts within the scope of their employment with the NHPD.

**118.** These Defendants performed the above-described acts under color of state law, deliberately, recklessly, and with deliberate indifference or reckless disregard for Mr. Gould's constitutional rights and innocence.

**119.** No reasonable officer in 1993, 1994, 1995, 2009, 2010, 2011, or 2012 would have believed this conduct was lawful.

**120.** Mr. Gould is completely innocent of the Vega murder. The prosecution finally terminated in Mr. Gould's favor on February 1, 2024, when his conviction was vacated and all charges against him were dismissed.

**121.** Defendants' actions were the direct and proximate cause of Mr. Gould's damages as described above.

## COUNT II

### 42 USC § 1983 – Malicious Prosecution in Violation of Fourth and Fourteenth Amendments

*Against Defendants Sullivan, Dease, Gethers, Wortz, Gleason, Burton*

**122.** Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

**123.** Defendants Sullivan, Dease, Gethers, Wortz, and Burton, acting individually and in concert with malice and knowing that probable cause did not exist to arrest and prosecute Mr. Gould for the Vega murder, caused Mr. Gould to be arrested, charged, and prosecuted for that murder, thereby violating Mr. Gould's clearly established right, under the Fourth and Fourteenth

Amendments of the United States Constitution, to be free from unreasonable seizures and prosecution and detention without probable cause.

**124.** Specifically, as described in detail above, Defendants Sullivan, Dease, Gethers, Wortz, and Burton, acting individually and in concert, fabricated evidence and intentionally withheld and misrepresented exculpatory facts that they knew vitiated probable cause against Mr. Gould and that they knew would have impeached witnesses for the prosecution in communications with the prosecution prior to the filing of charges against Mr. Gould, throughout his prosecution, at the probable cause hearing, at the criminal trial, at both *habeas* hearings, and at all other post-conviction hearings, including but not limited to the fact that the supposedly inculpatory statement of Doreen Stiles was obtained by coercion, was completely false, and was fabricated.

**125.** These Defendants performed the above-described acts within the scope of their employment with the NHPD.

**126.** These Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Plaintiff's clearly established constitutional rights. No reasonable officer in 1993, 1994, 1995, 2009, 2010, 2011, or 2012 would have believed this conduct was lawful.

**127.** Mr. Gould is completely innocent of the Vega murder.

**128.** The prosecution finally terminated in Mr. Gould's favor on February 1, 2024, when his conviction was vacated and all charges against him were dismissed.

**129.** The acts and omissions by these Defendants described in the preceding paragraphs were the direct and proximate cause of Mr. Gould's damages as described above.

## COUNT III

### 42 U.S.C. § 1983 Civil Rights Conspiracy

*Against Defendants Sullivan, Dease, Gethers, Wortz, Gleason, Burton, Coppola, Merced, Reyes*

**130.** Plaintiff incorporates by reference all of the foregoing paragraphs and further alleges:

**131.** Defendants Sullivan, Dease, Gethers, Wortz, Gleason, Burton, Coppola, Merced, and Reyes, acting within the scope of their employment and under color of state law, agreed among themselves and with other individuals, to act in concert in order to deprive Mr. Gould of his clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable seizures, malicious prosecution, and deprivation of liberty without due process of law, and to a fair trial.

**132.** In furtherance of the conspiracy, Defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

**a.** Fabricating inculpatory evidence in reports and tapes of false and coerced witness statements;

**b.** Intentionally or with deliberate indifference failing to comply with their duty to disclose *Brady* material during the pendency of the case;

**c.** Wrongfully arresting, prosecuting, and causing the conviction of Mr. Gould, knowing that they lacked probable cause;

**d.** Presenting false testimony during hearings and trials;

**e.** Engaging in further misconduct after Mr. Gould's conviction was vacated the first time, to cause it to be reinstated;

**f.** Thereafter suppressing and covering up evidence of their wrongdoing in all of the foregoing respects for a long period of time, while Mr. Gould remained in prison for a crime they knew he did not commit.

**133.** These Defendants performed the above-described acts under color of state law,

intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Gould's clearly established constitutional rights. No reasonable officer in 1993, 1994, 1995, 2009, 2010, 2011, or 2012 would have believed this conduct was lawful.

**134.** Mr. Gould is completely innocent of the Vega murder.

**135.** The prosecution finally terminated in Mr. Gould's favor on February 1, 2024, when his conviction was vacated and all charges against him were dismissed.

**136.** Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Gould's injuries.

## COUNT IV

### 42 U.S.C. § 1983 - Failure to Intercede

*Against Defendants Sullivan, Dease, Gethers, Wortz, Gleason, Burton, Coppola, Merced, Reyes*

**137.** Plaintiff incorporates by reference all of the foregoing paragraphs and further alleges:

**138.** By their conduct and under color of state law, Defendants Sullivan, Dease, Gethers, Wortz, Gleason, Burton, Coppola, Merced, and Reyes, acting within the scope of their employment with the NHPD, had opportunities to intercede on behalf of Mr. Gould to prevent and/or rectify his malicious prosecution, and the deprivation of his liberty without due process of law, but, due to their intentional conduct and/or reckless or deliberate indifference, failed to do so.

**139.** These Defendants' failures to intercede violated Mr. Gould's clearly established constitutional right to be free from police-fabricated evidence, and not to be deprived of exculpatory information. No reasonable police officer in 1993, 1994, 1995, 2009, 2010, 2011, or 2012 would have believed that failing to intercede to prevent and/or rectify the aforesaid fabrication of inculpatory evidence and the withholding of exculpatory and impeachment

evidence, was lawful.

**140.** Mr. Gould is completely innocent of the Vega murder.

**141.** The prosecution finally terminated in Mr. Gould's favor on February 1, 2024, when his conviction was vacated and all charges against him were dismissed.

**142.** Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Gould's damages as described above.

## COUNT V

### 42 U.S.C. § 1983 Municipal Liability Claim

*Against Defendant City of New Haven*

**143.** Plaintiff incorporates by reference all of the foregoing paragraphs and further alleges:

**Municipal liability based on the NHPD's custom, pattern, or practice of suppressing exculpatory and impeachment evidence from the prosecution**

**144.** Prior to and at the time of this unlawful investigation, prosecution, and conviction, NHPD officers and detectives, maintained a custom, pattern, or practice of suppressing exculpatory and impeachment evidence from the prosecution, including without limitation:

a. inconsistent statements provided by witnesses and suspects over the course of an interview; and

b. factors impacting a witness or suspect's credibility, such as their being under arrest on unrelated charges or their suffering from drug withdrawal at the time of the interview.

**145.** This ongoing policy, custom, pattern, or practice of suppression of exculpatory and impeachment evidence by NHPD officers is reflected in the multiple acts of suppression of such evidence committed by the individual Defendants and other NHPD personnel in relation to witness statements, both in Mr. Gould's case and other cases as detailed above.

**Municipal liability based on the NHPD's custom, pattern, or practice of engaging in unconstitutional investigative techniques**

**146.** Prior to and at the time of this unlawful investigation, prosecution, and conviction, NHPD officers and detectives, maintained a custom, pattern, or practice of unconstitutional investigative techniques, including but not limited to the following:

a. the use of coercive and suggestive techniques in interviews and interrogations to obtain witness statements that law enforcement knew or should have known were false;

b. the use of lengthy interrogations of which no record was made, to prompt and coerce witnesses;

c. the fabrication of inculpatory evidence, including witness statements;

d. the ongoing suppression of exculpatory and impeachment evidence; and

e. engaging in the affirmative suppression of such misconduct.

**147.** This ongoing policy, custom, pattern, or practice of unconstitutional investigative misconduct by NHPD officers is reflected in the multiple acts of misconduct and illegality committed by the individual Defendants and other NHPD personnel in relation to witness statements, both in Mr. Gould's case and other cases as detailed above.

**Municipal Liability based on the NHPD's failure to supervise, discipline, and train its officers and detectives with respect to unconstitutional investigative conduct**

**148.** Prior to and at the time of the unlawful investigation, prosecution, and conviction of Mr. Gould, the NHPD, by and through its final policymakers, maintained a policy, custom, pattern and practice of failing to adequately supervise, discipline and train NHPD officers and detectives, with respect to their use of unconstitutional investigative techniques, including but not limited to conducting custodial interrogations and witness interviews, documenting and

disclosing exculpatory and impeachment evidence to prosecutors, and the affirmative ongoing obligation to come forward with exculpatory and impeachment evidence.

**149.** The NHPD's policy, custom, pattern, or practice of failing to adequately supervise, discipline and train NHPD officers and detectives with regard to their use of unconstitutional investigative techniques is reflected in the numerous acts of misconduct and illegality committed by NHPD detectives and supervisors, both in Mr. Gould's case and other cases as detailed above, and the fact that these officers and detectives were permitted to continue to engage in such misconduct with impunity.

**150.** Defendant City of New Haven's acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Gould's damages as described above.

## STATE LAW CLAIMS

## COUNT VI

### Malicious Prosecution, in Violation of Connecticut State Law

*Against Defendants Sullivan, Dease, Gethers, Wortz, Gleason, Burton*

**151.** Plaintiff incorporates by reference all of the foregoing paragraphs and further alleges:

**152.** Defendants Sullivan, Dease, Gethers, Wortz, Gleason, and Burton, acting individually and in concert and within the scope of their employment with the NHPD, with malice and knowing that probable cause did not exist to prosecute Mr. Gould for the Vega homicide, caused Mr. Gould to be arrested, charged, and prosecuted for the murder, thereby violating Mr. Gould's clearly established right, under the Connecticut constitution and Connecticut common law, to be free of prosecution absent probable cause.

**153.** Specifically, as described in detail above, Defendants Sullivan, Dease, Gethers, Gleason, and Burton, acting individually and in concert, fabricated evidence and intentionally withheld

and misrepresented exculpatory facts that they knew vitiated probable cause against Mr. Gould and they knew would have impeached witnesses for the prosecution at the probable cause hearing, at the criminal trial, at both *habeas* hearings, and at all other post-conviction hearings, including but not limited to the fact that the supposedly inculpatory statements of Doreen Stiles were obtained by coercion, were completely false, and were fabricated.

**154.** These Defendants also failed to conduct a constitutionally adequate investigation in light of evidence pointing to other suspects and away from Mr. Gould.

**155.** These Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Gould's clearly established constitutional rights. No reasonable officer in 1993 or 1994 would have believed this conduct was lawful.

**156.** Mr. Gould is completely innocent of the murder of Mr. Vega. The prosecution finally terminated in Mr. Gould's favor on February 1, 2024, when all charges against him were dismissed.

**157.** Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Gould's injuries. Defendants knew, or should have known, that their conduct would result in Mr. Gould's wrongful arrest, prosecution, conviction, and incarceration.

## COUNT VII

### Negligence, in Violation of Plaintiff's Civil Rights under Connecticut Law

*Against Defendants Sullivan, Dease, Gethers, Wortz, Gleason, Burton, Coppola, Merced, Reyes*

**158.** Plaintiff incorporates by reference all of the foregoing paragraphs and further alleges:

**159.** Defendants Sullivan, Dease, Gethers, Wortz, Gleason, Burton, Coppola, Merced, and Reyes were police personnel acting within the scope of their employment and under color of law,

who had a duty to Mr. Gould to exercise reasonable care in the investigation and arrest of Mr. Gould for the Vega homicide and in the investigation, reporting and disclosure of evidence related thereto, to protect him from the unlawful and negligent conduct of other NHPD personnel, to prevent and/or rectify the fabrication of evidence, and to fulfill their ongoing duty to disclose all exculpatory and impeachment evidence pursuant to Plaintiff's civil rights entitlements under the federal and Connecticut constitutions, Conn. Gen. Stat. § 54-86c(c), and Connecticut common law.

**160.** Defendants negligently failed to fulfill those duties by their conduct set forth above.

**161.** It was and should have been apparent to Defendants that said negligent conduct was likely to violate Mr. Gould's civil rights, and to subject him, a specifically identifiable victim of their negligent misconduct, to severe and imminent harm on a continuing basis.

**162.** As a direct and proximate result of the negligence and breach of duty of the Defendants as aforesaid, Mr. Gould suffered severe and ongoing damages as described above.

## COUNT VIII

### Intentional Infliction of Emotional Distress in Violation of Connecticut State Law

*Against Defendants Sullivan, Dease, Gethers, Wortz, Gleason, Burton*

**163.** Plaintiff incorporates by reference all of the foregoing paragraphs and further alleges:

**164.** Defendants Sullivan, Dease, Gethers, Wortz, Gleason, and Burton, acting individually and in concert with improper purpose and without legal justification, with intention to cause or with reckless disregard of the probability of causing emotional distress, engaged in extreme and outrageous conduct. Specifically, as described in detail above, these Defendants, acting individually and in concert, fabricated evidence and intentionally withheld and misrepresented exculpatory facts that they knew would have impeached witnesses for the prosecution at the

probable cause hearing, at trial, and at the second *habeas* hearing, and caused Mr. Gould to be arrested, charged and prosecuted for the Vega murder knowing that the evidence against him was false and fabricated. Knowing that Mr. Gould was innocent, these Defendants intentionally fabricated evidence and withheld material exculpatory evidence to cause Mr. Gould severe emotional distress. These Defendants knew or should have known that their actions would likely result in inflicting emotional distress on Mr. Gould.

**165.** These Defendants were police personnel acting within the scope of their employment and under color of law, who had a duty to Mr. Gould to exercise reasonable care in investigating and arresting him for the Vega homicide and in the investigation, reporting and disclosure of evidence related thereto, to protect him from the unlawful conduct of other NHPD personnel, to prevent and/or rectify the fabrication of evidence, and to fulfill their ongoing duty to disclose all exculpatory and impeachment evidence pursuant to Plaintiff's civil rights entitlements under the federal and Connecticut constitutions, Conn. Gen. Stat. § 54-86c(c), and Connecticut common law.

**166.** The misconduct of these Defendants, as described throughout this Complaint, constituted fraudulent, dishonest, and corrupt means of obtaining the arrest, prosecution, conviction, and confinement of Mr. Gould for the Vega murder.

**167.** These acts and omissions were undertaken with malice, and resulted in the intentional and unlawful arrest, prosecution, conviction, and confinement of Mr. Gould.

**168.** As a direct and proximate result of these Defendants' fabrication of evidence and failure to disclose exculpatory evidence, Mr. Gould was wrongfully incarcerated for more than 26 years and lived with a wrongful conviction for 30 years and suffered severe emotional suffering and serious mental distress.

## COUNT IX

**Negligent Infliction of Emotional Distress in Violation of Connecticut State Law**

*Against Defendants Sullivan, Dease, Gethers, Wortz, Gleason, Burton, Coppola, Merced, Reyes*

**169.** Plaintiff incorporates by reference all of the foregoing paragraphs and further alleges:

**170.** Defendants Sullivan, Dease, Gethers, Wortz, Gleason, Burton, Coppola, Merced, and Reyes were police personnel acting within the scope of their employment and under color of law, who had a duty to Mr. Gould to exercise reasonable care in his investigation and arrest for the Vega homicide and in the investigation, reporting and disclosure of evidence related thereto, to protect him from the unlawful and negligent conduct of other NHPD personnel, to prevent and/or rectify the fabrication of evidence, and to fulfill their ongoing duty to disclose all exculpatory and impeachment evidence pursuant to Plaintiff's civil rights entitlements under the federal and Connecticut constitutions, Conn. Gen. Stat. § 54-86c(c), and Connecticut common law.

**171.** Defendants, through negligence, caused Mr. Gould to be wrongfully prosecuted for crimes he did not commit. Had it not been for Defendants' negligence, Mr. Gould would not have been incarcerated for more than 26 years and wrongfully convicted for three decades.

**172.** It was and should have been apparent to Defendants that said negligent conduct was likely to violate Mr. Gould's civil rights, and to subject him, a specifically identifiable victim of their negligent misconduct, to severe and imminent harm on a continuing basis.

**173.** As a direct and proximate result of these Defendants' negligence, Mr. Gould was wrongfully incarcerated for more than 26 years and lived with a wrongful conviction for 30 years and he suffered severe emotional suffering and serious mental distress.

## COUNT X

**Indemnification under Conn. Gen. Stat. §7-465**

*Against the City of New Haven*

**174.** Plaintiff incorporates by reference all of the foregoing paragraphs and further alleges:

**175.** As described in the preceding paragraphs and Counts, the Individual Defendants Sullivan, Dease, Gethers, Wortz, Gleason, Burton, Coppola, Merced, and Reyes were police personnel acting within the scope of their employment and under color of law.

**176.** As set forth above, said Defendants infringed Plaintiff's federal and state civil rights and Connecticut statutory and common law rights and caused him personal injuries and damages while performing their duties and acting within the scope of their employment.

**177.** As a direct and proximate result of this conduct, Plaintiff suffered severe and ongoing damages as hereinbefore alleged.

**178.** Within six months after the foregoing causes of action accrued, pursuant to Conn. Gen. Stat. § 7-465, Plaintiff filed with the clerk of the City of New Haven written notice of his intention to commence this action and of the time when and the place where the damages were incurred or sustained.

**179.** To the extent the Individual Defendants are determined to be liable to Mr. Gould and are obligated to pay damages, under any of Counts I, IV, and/or VIII, Defendant City of New Haven is liable to pay any such damages on behalf of the Individual Defendants pursuant to the City of New Haven's statutory liability imposed by Conn. Gen. Stat. §7-465.

**<u>COUNT XI</u>**

**Direct Action under Conn. Gen. Stat. § 52-557n**

*Against the City of New Haven*

**180.** Plaintiff incorporates by reference all of the foregoing paragraphs and further alleges:

**181.** The City of New Haven, its police department, and the individual Defendants—all acting

under color of law—had a duty to Mr. Gould to exercise reasonable care in the investigation and arrest of Plaintiff for the Vega murder and in the investigation, reporting and disclosure of evidence related thereto, to protect him from the unlawful and/or negligent conduct of NHPD personnel, and to prevent and/or rectify the violation of his civil rights, including the suppression of exculpatory and impeachment evidence.

**182.** As discussed above, the City, the NHPD, and the other Defendants breached these duties in a number of ways, thereby directly and proximately causing Mr. Gould's wrongful arrest, prosecution, conviction, and incarceration.

**183.** In addition, the City of New Haven and its police department failed to exercise reasonable care in preventing and/or rectifying the fabrication of inculpatory evidence, in the misuse of the pre-interview procedure and the failure to document, preserve and disclose any record thereof, and in its ongoing failure to establish adequate procedures and oversight for preservation and disclosure of exculpatory evidence and for compliance with the mandatory provisions of Conn. Gen. Stat. § 54-86c(c), and thereby itself proximately causing Mr. Gould's wrongful arrest, prosecution, conviction, and continued incarceration.

**184.** Even to the extent the City, its police department and the other defendants were performing discretionary functions in some of the foregoing respects, they disregarded the risk of imminent harm to Plaintiff, an identifiable person.

**185.** Pursuant to the statutory liability imposed by Conn. Gen. Stat. § 52-557n, the City of New Haven is liable for the damages caused by the acts and omissions of the other Defendants and by its own acts and omissions as alleged herein.

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

a. Compensatory damages against all Defendants in an amount to be determined at trial;

b. Punitive damages against Individual Defendants, in an amount to be determined at trial;

c. Pre-judgment and post-judgment interest and recovery of Plaintiff's costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

d. Such other and further relief as this Court may deem just and proper.

Dated: New Haven, Connecticut
August 3, 2026

Respectfully submitted,

*/s/ Grace Paras*

Nick Brustin*
Emma Freudenberger*
Grace Paras*
Hayley Bork*
NEUFELD SCHECK BRUSTIN
HOFFMANN & FREUDENBERGER, LLP
200 Varick Street, Suite 800
New York, New York 10014
(212) 965-9081
nick@nsbhf.com
emma@nsbhf.com
grace@nsbhf.com
hayley@nsbhf.com

Richard Emanuel
LAW OFFICES OF RICHARD EMANUEL
61 Grist Mill Circle
Guilford, CT 06437
(203) 710-3178

newtrials@comcast.net

*Counsel for Plaintiff George Gould*

**Attorneys admitted* Pro Hac Vice.