**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT**

GEORGE GOULD,

Plaintiff,

v.

The CITY OF NEW HAVEN, BRIAN SULLIVAN, KEITH WORTZ, LEE DEASE, *Personal Representative of the Estate of Leroy Dease*, JOHN CARANGELO, *Personal Representative of the Estate of Percy Gethers*, DANIEL GLEASON, GIL BURTON, STEPHEN COPPOLA, MATTHEW MERCED, OTHONIEL REYES, *in their individual capacities*, and JOHN AND JANE DOES.

Defendants.

**Case No. 3:25-cv-934**

# PLAINTIFFS' RESPONSE IN OPPOSITION TO THE CITY OF NEW HAVEN'S MOTION TO BIFURCATE AND STAY DISCOVERY ON PLAINTIFFS' *MONELL* CLAIM

**TABLE OF CONTENTS**

INTRODUCTION .......... 3

PROCEDURAL HISTORY .......... 6

STANDARD .......... 6

ARGUMENT .......... 7

I. Bifurcation of discovery would be highly inefficient in Plaintiffs' cases. .......... 7

A. Plaintiffs' counsel has already developed the bulk of their *Monell* evidence through the Morant litigation. .......... 7

B. Litigation of the *Monell* claim will almost certainly be necessary. .......... 14

II. Bifurcation of discovery would not spare Defendants any prejudice, but would prejudice Plaintiffs. .......... 17

CONCLUSION .......... 19

## INTRODUCTION

The party seeking to depart from the typical rule of a unitary discovery period and trial must make a fact-specific demonstration for why bifurcation is warranted. Not only does the City fail to do so, it studiously avoids mention of any specific facts regarding individual or *Monell* liability in this case. For good reason: there is no plausible argument here that bifurcation would do anything other than multiply the proceedings and cause excessive delay in a case that arises out of events over thirty years ago. Indeed, the City of New Haven has made a similar bifurcation request in each of the pending § 1983 wrongful conviction suits against them, and every court has rejected it—including this one in the *Horn* and *Jackson* cases.[1] This Court should do the same here.

Although depositions have yet to start (largely due to the City's intransigence in producing documents over the course of discovery), there is already a substantial record of both individual and *Monell* liability that was developed as part of the closely related *Morant* case. The primary "witness" who caused Gould and Taylor's wrongful convictions, Doreen Stiles, has previously described under oath how after initially telling the officers the truth—that she knew nothing about the crime—she provided false testimony implicating them because she was addicted to heroin and understood that the only way she could leave and get her fix was to tell the officers what they wanted to hear. *See* Ex. D, Stiles Tr., *Gould, et al. v. Warden* (Aug. 3, 2009) at 53:17–60:21,

[1] *See* Ex. A, Order, *Morant v. City of New Haven*, No. 22-cv-630 (Feb. 4, 2026), ECF No. 263 (denying City's motion to bifurcate on the grounds that duplicate jury addresses, duplicate jury instructions, duplicate deliberations, and duplicative witnesses would be inefficient and because a limiting instruction would sufficiently ameliorate any potential prejudice); Ex. B, Order, *Carmon v. City of New Haven, et al.*, No. 23-cv-944 (Jan. 22, 2026), ECF No. 298 at 3 (denying bifurcation of individual and *Monell* liability for trial on the grounds that it would be inefficient and also because two defendants were already deceased, meriting against further delay); Ex. C, Order, *Horn v. City of New Haven*, No. 19-cv-388 (Dec. 18, 2025), ECF No. 330 at 1 (minute order denying bifurcation of the individual and *Monell* liability portions of the trial).

109:24–110:27; Ex. E, Stiles Tr., *State v. O'Donnell* (Sept. 25, 2013) at 38:5–43:1, 73:4–81:17, 92:23–94:1, 103:19–104:1. Stiles also testified under oath that after she gave her statement in the investigation, Defendants Brian Sullivan and Daniel Gleason introduced her to other officers, and informed them she was working with the police and not to arrest her. *See* Ex. D, Stiles Tr., *Gould* (Aug. 3, 2009) at 115:6–116:23.

Remarkably, Sullivan admits he understood almost all of that at the time, yet consistent with NHPD practices, he failed to disclose this critical exculpatory and impeachment evidence. He admits he understood that Stiles was a serious heroin user in active withdrawal who had been arrested for prostitution; that she initially denied any knowledge of the crime; that he interviewed her for six hours and told her she could not leave until she told the police what they wanted to hear; and that after she gave the statement, he drove her to a known drug area and gave her $60, which he understood she would use to buy heroin. Sullivan admits that after she bought the drugs, he then allowed her to reenter his car with the heroin and drove her home. And Sullivan admits that although he understood all of these factors could lead Stiles to give false testimony, he did not document any of this exculpatory and impeachment information or share it with the prosecutor, because he was following the custom and practice of the NHPD at the time. In fact, all the officers, including Sullivan, reported or testified that Stiles gave her statement implicating Plaintiffs without any pressure, threats, or incentives. Sullivan's testimony was presented to the *Morant* jury and was part of the basis for that jury's *Monell* finding that the City had a widespread custom or practice of suppressing evidence that was favorable to criminal defendants in the early 1990s. *See* Ex. F,

Sullivan Trial Tr., *Morant* (May 14, 2026), at 2546:3–2558:24, 2567:19–2569:24, 2641:20–2643:1.[2]

In other words, there is not only already overwhelming proof of both individual and *Monell* liability in this case, but it's also clear that the proof of individual misconduct and *Monell* liability is completely intertwined. And because the *Monell* theories here are so closely related to those just litigated in *Morant*, and so much evidence was amassed as part of that litigation, there is comparatively little to do in *Monell* discovery here. Indeed, Plaintiffs contend the City will be collaterally estopped by the *Morant* verdict from contesting the existence of the custom of suppressing *Brady* material at the time, narrowing the issues in dispute on *Monell* to solely whether that custom caused the violation in this case.

In short, it is hard to imagine a case in which bifurcation is less appropriate than it would be here. And while a bifurcated proceeding will inevitably take longer to complete than a unitary one if it proceeds to the second phase, the delay under the City's specific proposal here would be enormous. The City proposes that *Monell* discovery would be delayed until after a *trial* on the individual liability claims. Not only would that delay ultimate resolution of this case for many additional years, it would long postpone any further discovery on the *Monell* claims in this decades-old case, risking losing any ability to gather any additional relevant evidence on those claims. Plaintiff Ronald Taylor is already deceased. Key detectives investigating the matter, Defendants Percy Gethers and Leroy Dease, are deceased. Key witnesses related to the *Monell* claims are already deceased.[3] Further delay for bifurcation, especially where the City can articulate

---

[2] Counsel for the City represents the City in both the instant cases and the *Morant* litigation. Though relatively new to these cases, counsel should be familiar with the evidence Plaintiffs cite, but for ease of everyone's reference, we attach evidence as exhibits to this motion.

[3] For example, though former NHPD Chief Nicholas Pastore and former NHPD Lieutenant Robert Lawlor testified in depositions in the *Morant* litigation, they are now deceased.

no factual argument and describe no prejudice, would be extremely prejudicial to Plaintiffs. The City's motion should be denied.

## PROCEDURAL HISTORY

The City's recounting of the procedural history in this case leaves out that it has missed countless discovery deadlines for almost a year despite frequent and consistent follow-ups by Plaintiffs' counsel. The scheduling order was entered by this Court on September 10, 2025. *See Gould*, No. 25-cv-934, ECF No. 83. Plaintiffs issued their first set of requests for production to the City on October 24, 2025. It took the City six months (until March 13, 2026) from the opening of discovery to produce the file from the underlying investigation into the Vega murder—a basic and obvious document that should have been part of its Rule 26 disclosures. Despite frequent follow up from Plaintiffs' counsel via email and phone, the City did not produce any additional responsive documents until June 9, 2026. Obtaining new counsel does absolve the City of the massive delays it has caused in discovery in the case.[4] And it is inappropriate for the City to now seek to leverage discovery delays it caused as support for its bifurcation motion.

## STANDARD

"Bifurcation is…the exception, not the rule." *Svege v. Mercedes-Benz Credit Corp.*, 329 F. Supp. 2d 283, 284 (D. Conn. 2004) (discussing bifurcation of trial); *Renois v. WVMF Funding, LLC*, No. 20-cv-9281, 2024 WL 6043237, at *1 (S.D.N.Y. Nov. 1, 2024), *objections overruled*, No. 20-cv-9281, 2025 WL 1746910 (S.D.N.Y. June 24, 2025) (stating that "bifurcating discovery … is the exception in this Circuit"). The decision whether or not to bifurcate discovery or a trial is left to the sound discretion of the Court and should be made on a case-by-case basis considering

[4] Over the summer, with new counsel, the City began producing responsive documents, but production is not yet complete.

factors such as whether doing so will promote efficiency or is necessary to avoid prejudice or juror confusion. *See Belz v. Peerless Ins. Co.*, No. 13-cv-01315, 2014 WL 12758469, at *1 (D. Conn. Oct. 20, 2014); *see also* Fed. R. Civ. P. 42(b) ("For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues [or] claims …."). "The moving party bears the burden of establishing that bifurcation is warranted." *Byrne v. Yale Univ., Inc.*, No. 3:17-CV-1104 (VLB), 2020 WL 5258998, at *13 (D. Conn. Sept. 3, 2020); *see also Hall-Landers v. New York Univ.*, No. 20-cv-3250, 2023 WL 8113243, at *3 (S.D.N.Y. Nov. 22, 2023).

## ARGUMENT

### I. Bifurcation of discovery would be highly inefficient in Plaintiffs' cases.

#### A. Plaintiffs' counsel has already developed the bulk of their *Monell* evidence through the *Morant* litigation.

The City premises its argument for bifurcation on the claim that "there remains a great deal to be done in order to prove" that the NHPD had a custom and practice of suppressing exculpatory and impeachment evidence. ECF No. 120-1 at 4. Not so.

First, a jury already found that the City had a widespread custom and practice of suppressing evidence favorable to criminal defendants in the early 1990s, and Plaintiffs contend the City will be collaterally estopped from contesting that finding. Although that issue has not yet been briefed here, similar briefing in the Horn and Jackson matters provides a preview. *See* Ex. G, Pls.' Mot., *Horn* (July 10, 2026), ECF No. 420-1 at 19–25; Ex. H, City's Resp., *Horn*, ECF No. 468 (July 24, 2026). In short, collateral estoppel establishes "the preclusive effect of a prior federal judgment" if the following requirements are met: "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was

necessary to support a valid and final judgment on the merits." *Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006). All are met here.

There is no question that the existence of a widespread custom of suppressing favorable information at the NHPD in the early 1990s was (2) actually litigated and decided in the *Morant* case; that (3) the City had a full and fair opportunity to litigate it, or that (4) the resolution was necessary to support the *Monell* judgment. Nor is there any reasonable question that that issue is identical to what is at issue in this case. The crime for which Mr. Morant was wrongfully convicted took place in 1990, and he was convicted in 1994. Here, the crime for which Plaintiffs were wrongfully convicted took place in 1993 and they were convicted in 1995—the same time period for which the jury made its finding against the City in *Morant*. Plaintiffs allege extremely similar misconduct here as in the *Morant* case: that officers coerced sham witnesses to place Plaintiffs at the scene, but did not record their coercive efforts, nor that the witnesses originally told police that they were not at the scene and knew nothing of the crime—and that these officers did so because it was the custom and practice of the NHPD in the early 1990s to suppress *Brady* evidence. The nature of the misconduct and the timeframe of Plaintiffs' claims are almost the exact same as in *Morant*—and even stronger than in the *Horn* and *Jackson* cases. In light of this jury verdict, the City should be collaterally estopped from arguing in this case that it did not have a practice or custom of suppressing evidence favorable to Plaintiffs, leaving only minimal questions for a jury to answer at a *Monell* trial.

And even if the City were not estopped, through the *Morant* litigation, Plaintiffs' counsel has developed the bulk of the *Monell* evidence that we will use to prove that the City had a practice and custom of conducting coercive interviews and failing to record exculpatory and impeachment evidence developed during those interviews.

First, there is Sullivan's testimony referenced above about the misconduct he and other individual Defendants committed during their dealings with Doreen Stiles. In her statement to the NHPD, Stiles stated that she was not under arrest and not under the influence of any drugs that would affect her responses to the officers' questions. And though Stiles initially said she knew nothing about the crime, Sullivan interrogated her for six hours and told her she couldn't leave until she gave a statement. Ultimately, Stiles provided a statement that included the details that Sullivan needed in order to pin the crime on Plaintiffs. It was not until the *Morant* litigation that Sullivan admitted that he knew that Stiles had indeed been arrested for prostitution, under the influence of heroin, and in active drug withdrawal at the time of her interrogation. He testified that he understood these factors made Stiles a more vulnerable witness. Further, Sullivan admitted to additional grievous misconduct with Stiles including that he told her that if she gave him the statement he wanted, he would give her money and take her to her drug dealer so she could buy heroin. Sullivan admitted that he indeed gave her $60, drove her to her drug dealer, waited for her to make the drug purchase, and allowed her to then reenter his vehicle with the heroin in tow. He admitted that he never reported or memorialized his inducement to Stiles. In fact, Sullivan signed off on Defendant Percy Gethers's report regarding the Stiles interview, which falsely indicated that Stiles readily volunteered her account without prompting. Although Sullivan admitted he understood all these things were relevant to the reliability and credibility of Stiles's statement—and specifically could cause her to say things that were not true—in the NHPD in the early 1990s such information which was "not good for the case" would not be included in police reports. *See* Ex. F, Sullivan Trial Tr., *Morant* (May 14, 2026) at 2567:19–2568:19, 2641:20–2643:1, 2643:17–2644:7. And Sullivan described how what he did with Stiles was consistent with NHPD practices at the time: he would have been comfortable discussing all of it with Chief Pastore and "as far as

[he] understood, Chief Pastore would have been fully on board with what [he] did." *Id.* at 2569:20–24; 2570:1–4.

In addition to Sullivan's testimony, Sergeant Michael Sweeney, an NHPD homicide supervisor for years, testified at the *Morant* trial that "there was an expectation that exculpatory and impeachment evidence would not be documented in police reports" and that "you don't put things in police reports that will hurt the case…in 1990 and 1991 in New Haven." Ex. I, Sweeney Trial Tr., *Morant* at 208:6–25; *see also id.* at 584:10–16 (also testifying that this manner of documenting cases "was consistent with [his] understanding of what the department expected" of his subordinates and him). Sweeney testified based on his experience directly supervising homicide detectives for years and stated that he didn't know "any detective during that time period that would put down information for the defense to attack the case." *Id.* at 212:10–14.

Joseph Pettola, another longtime NHPD detective who the City's own 30(b)(6) witness testified had a particularly good reputation for truthfulness, Ex. J, Dell Dep., *Morant* (Jan. 17, 2024) at 69:23–71:6, agreed with Sweeney's description of the practice. Pettola testified the practice generally at the NHPD "was not to turn over exculpatory evidence from detective notes" and agreed that "although police officers were obligated to report" exculpatory evidence "in their police reports, as a general matter, people in the Department…didn't document that type of information as a matter of practice." Ex. K, Pettola Tr., *Morant* (May 7, 2026) at 1411:2–19. Pettola further described how in the NHPD, in the early 1990s, "even when sergeants observed…misconduct, there was pressure not to report it." *Id.* at 1412:2–1413:10. And Pettola described how "as a rule—even though police officers understood that they were supposed to write down in police reports inconsistent statements that witnesses might give…detectives typically

didn't do that" and that "routinely officers would interview witnesses for long periods of time, get multiple versions of what happened, and only document" one of them. *Id.* at 1412:13–23.

The City's own Rule 30(b)(6) designee, Rose Dell, testified in a deposition in the *Morant* litigation that it was the regular practice at the NHPD in 1991 to conduct long, unrecorded interviews and only take a recorded statement at the end of the interview, and that there was no policy or training requiring detectives to take notes during those unrecorded interviews or, if they happened to take such notes, to turn them over to the prosecutor. Ex. J, Dell Dep., *Morant* (Jan. 17, 2024), at 42:8–43:5, 43:22–44:13, 45:5–22. She also admitted no NHPD rule or policy even mentioned the words "exculpatory" or "impeachment" until 2016. *Id.* at 49:15–50:21, 51:9–14, 54:1–24.[5]

Mr. Morant's police practices expert, Charles Drago, described how the practices these witnesses described at the NHPD for documenting and disclosing exculpatory and impeachment evidence were inconsistent with minimally accepted police practices which had been well known in police departments for decades by 1990. *See* Ex. L, Charles Drago Trial Tr., *Morant* (May 12, 2026) at 2160:8–2161:19; 2165:12–2166:10. Drago testified that in his forty plus years of law enforcement experience, he had never seen such admissions of a widespread practice across a department of not disclosing exculpatory or impeachment evidence: "I never have. And as I said,

[5] Ms. Dell's testimony on the matter contradicts the City's assertion that it will be "no small feat" for Plaintiffs to prove a policy or practice where "a department's formal written policies expressly *prohibit* the sorts of violations alleged." ECF No. 120-1 at 4. The City made this argument at the *Morant* trial and the jury rejected it. Also, a municipality may be liable even though it had a written policy in compliance with the law if that municipality fomented an illegal custom and practice contradicting the policy. *See Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996) (holding that an actionable "policy or custom need not be memorialized in a specific rule or regulation" for the City to be liable).

I've been policing for many, many years and as an expert witness across the country for many, many years and I have never seen it to that extent, no." *Id.* at 2165:12–2166:10.

In light of these sworn admissions, Plaintiffs need not double down collecting a slew of new evidence to build their *Monell* case. *See, e.g.*, *Jeffes v. Barnes*, 208 F.3d 49, 62 (2d Cir. 2000) (highlighting that the testimony of one officer responsible for day-to-day operations at jail about "constant adherence to the code of silence," along with one example, supported a jury finding "that the code of silence was a practice or custom that constituted the municipality's standard operating procedure"). Rather, Plaintiffs anticipate they will seek only minimal supplementation of the *Monell* evidence already collected from the *Morant* litigation. The City's argument that bifurcation is warranted because *Monell* discovery would allegedly be "extremely time-consuming and costly for all parties," ECF No. 120-1 at 3, is simply incorrect.

Nor do the City's few specific forecasts about the alleged burdens of *Monell* discovery have any more merit. First, the City, will not, as it claims "have to devote significant time and expense to identifying and preparing an appropriate witness" if Plaintiffs were to seek a Rule 30(b)(6) deposition. *See* ECF No. 120-1 at 4. As explained above, in the *Morant* litigation the City has already identified Dell as a designee to testify on NHPD policies, practices, customs, and procedures in place from 1990–2000, and any modifications to them. This time period encompasses the time of the Vega investigation and Plaintiffs' convictions. *See* Ex. M, Am. Notice of Dep. of Rose Dell, *Morant* (Dec. 22, 2023). Counsel for the City prepared Dell to testify on a range of relevant topics, including but not limited to the documentation and disclosure of exculpatory and impeachment evidence and the duties of officers at various roles in the chain of command. *Id.* at 2–3; Ex. J, Dell Dep., *Morant* (Jan. 17, 2024) at 17:15–17 (confirming preparedness to discuss every topic in the Notice). The City could easily designate Dell again; if it

picked a new designee her admissions may be used both for their truth and to impeach the City's designee in the instant cases should the City's designee contradict Dell. *See* Fed. R. Ev. 801(d)(2).

Furthermore, the City asserts that discovery and trial should be bifurcated in order to save the parties the time and expense to engage police practices experts. *See* ECF No. 120-1. This proposal would cost Plaintiffs and Defendants significantly more. A legitimate police practices expert would not consider the individual officers' actions in a vacuum, but rather would examine the policies and customs in place at the NHPD at the time of the investigation. To have an expert review the City's policies and practices, as well as relevant testimony about its customs, then—were it even possible—write a report only on individual liability, only to have the expert re-review to write up a *Monell* section of a report months later would be incredibly inefficient and duplicative of the expert's efforts. Further, it would be much more costly for a party to cover the travel expenses and testimony fees for experts to testify at two separate trials before two separate juries than it would be for the expert to testify once. Finally, the City's argument ignores that Plaintiffs' counsel and counsel for the City have already engaged experts to review the NHPD's *Brady* policies at the relevant time period, which would save significant time and costs in generating expert reports.

Finally, the City claims bifurcation is warranted because "the City will need to gather testimony from as many officers as possible to rebut Plaintiffs' evidence." ECF No. 120-1 at 4. The uniform evidence presented during the *Morant* trial supported the jury finding that the suppression of exculpatory evidence was the City's practice; the City has not identified any officers it claims would testify to the contrary. And, of course, if the City is collaterally estopped by the *Morant* finding, as Plaintiffs contend, it would be precluded from relitigating the existence of this practice even if it could find one. But in any event, the City provides no authority suggesting its

desire to investigate a defense would justify bifurcating *Monell* discovery. To the contrary, given the age of the case and the likely age of any such witnesses who were active detectives over thirty years ago, delaying such *Monell* discovery for years may well preclude either side from ever collecting relevant evidence.

### B. Litigation of the *Monell* claim will almost certainly be necessary.

It is undeniable that the only way bifurcation can save time and effort is if the second phase is ultimately unnecessary. Otherwise, spreading discovery, dispositive motion briefing, and trial over two separate staggered phases would invariably duplicate effort and delay ultimate resolution of the case, likely for many years. Thus, the City's argument for bifurcation is predicated on the assertion that litigation of the *Monell* claim is likely to be unnecessary. But that assertion is also false here.

First, the City claims litigation of the *Monell* claims would be unnecessary after a finding of individual liability if the City were liable to satisfy the verdict on another ground, such as indemnification. But while the City merely states that "Plaintiffs *allege* that the City must indemnify the Individual Defendants for any compensatory damages awarded under Counts I, IV, or VIII of their operative complaints," ECF No. 120-1 at 5, 6 (emphasis added), it notably makes no representation that it would indemnify. The *Morant* litigation is again instructive; there, the City vehemently opposed indemnifying the individual officers post-verdict, in both its briefing and its public statements. *See* Ex. N, City's Rule 50(b) Mem. of Law, *Morant*, ECF No. 618-1 (June 26, 2026) at 17–20; Ex. O, Statement by Mayor Elicker on the Jury's Verdict in the Lawsuit *Morant v. City of New Haven, et al.* (May 29, 2026, 4:18 p.m.) ("The city and its residents should not be made to pay damages for the actions of two officers who knowingly wrongfully engaged in

isolated, unsanctioned actions over 35 years ago.").[6] Given this history—and absent an absolute pledge to fully indemnify any officer for an individual liability verdict—this hardly provides any basis to believe litigation of the *Monell* claims would be unnecessary.

Nor is the possibility of direct liability on state law claims an adequate substitute for *Monell* liability. First, the City's derivative liability is only for state law claims, not § 1983 claims. And again, the City itself argued in *Morant* that such liability was mutually exclusive with § 1983 liability. *See* Ex. N, City's Rule 50(b) Mem. of Law, *Morant*, ECF No. 618-1 (June 26, 2026) at 17–21. Second, the damages available are not identical; for one thing, there is no entitlement to § 1988 attorney fees on solely state law claims.

Notably, the City's unwillingness to indemnify on the § 1983 individual liability claims distinguishes the authority it cites in support of its motion. Although as noted above the City has litigated and lost bifurcation motions in a number of similar § 1983 wrongful conviction suits, the authority it cites in support of bifurcation not only arises in the context of very different factual claims (where the *Monell* evidence may well be both extensive and distinct from the evidence of underlying liability), but also a different location: the City of New York. This is significant because, unlike New Haven, the City of New York almost invariably indemnifies its officers for constitutional violations. In addition, unlike Connecticut, New York has respondeat superior liability for state-tort analogues to many civil rights claims, including malicious prosecution, false arrest, and assault and battery. *See, e.g.*, *Triolo v. Nassau Cnty.*, 24 F.4th 98, 110–11 (2d Cir. 2022) (explaining that "New York law is clear that municipalities can be liable for the actions of police officers" for state-law claims including false arrest, assault, and battery). As a result, in New York, unlike in New Haven, there is a significant likelihood that litigation of the *Monell* claim will be

---

[6] Available at: https://www.newhavenct.gov/Home/Components/News/News/711/463.

unnecessary to ensure full payment of a judgment on a § 1983 suit against an individual officer.[7] That is simply not true with New Haven.

While given the record amassed to date it is highly unlikely that Plaintiffs will not prevail on even one of their claims against the individual Defendants, the City's assertion that such a defense verdict would make the *Monell* issue moot is also false. ECF No. 120-1 at 5. The Second Circuit held in *Barrett v. Orange Cnty. Hum. Rts. Comm'n*, 194 F.3d 341, 350 (2d Cir. 1999) that "*Monell* municipal liability for constitutional injuries may be found to exist even in the absence of individual liability, at least so long as the injuries complained of are not solely attributable to the actions of named individual defendants." For example, even were a jury to decline to find any particular individual Defendant responsible for Plaintiffs' constitutional rights violations, the Second Circuit has found that *Monell* liability still exists where "the combined acts or omissions of several employees acting under a governmental policy or custom may violate those rights." *Id.* (internal quotation marks omitted); *see also Rutigliano v. City of New York*, 326 F. App'x 5, 9 (2d Cir. 2009). That could very well be the case here given the evidence of systemic failures at the NHPD, leading multiple officers to withhold exculpatory evidence from the prosecution. And the City itself recognizes that there are circumstances in which *Monell* discovery and trial can move

---

[7] There is no plausible argument that the individual Defendants would be able to pay the damages on a verdict against them as the City suggests. *See* ECF No. 120-1 at 6 ("The only scenarios in which a *Monell* trial (and related discovery) would be necessary are if the officers are found to have committed a constitutional violation, but (a) are also found to be entitled to qualified immunity, or (b) are unable to pay the judgment against them and there is no basis for indemnification or derivative liability for the City."). The City understands how expensive these cases are. *See* Ex. P, Judgment, *Morant*, ECF No. 575 (May 29, 2026) (entering $38 million judgment in favor of Plaintiff); Ex. Q, City of New Haven, Statement by Mayor Elicker On Settlement Agreements in the Lawsuits *Horn v. City of New Haven, et al* and *Jackson v. City of New Haven*, et al. (Aug. 12, 2026, 5:08 p.m.), available at https://www.newhavenct.gov/Home/Components/News/News/729/144 ($30.5 million settlement for two plaintiffs' wrongful conviction claims against individual Defendants and the City).

forward even in the absence of a finding of individual liability, such as where the individual Defendants are protected by qualified immunity or in the event that individual Defendants are unable to pay the judgment against them (which will all but certainly be the case if Plaintiffs prevail) and there is no basis for indemnification. *See* ECF No. 120-1 at 6. Finally, if Plaintiffs so desired, they could choose to litigate their *Monell* claims for “nonmonetary considerations” such as “deterrence, accountability, and justice.” *Gibson v. City of Chicago*, No. 19 C 4152, 2021 WL 2127182, at *2 (N.D. Ill. Apr. 6, 2021).

In short, given the known facts here it is exceptionally unlikely that, were it bifurcated, litigation of the *Monell* claim would be ultimately be unnecessary. That is fatal to the City’s argument that bifurcation could promote efficiency or convenience. The reality is it would greatly multiply the proceedings and delay the ultimate resolution of the litigation.

## II. Bifurcation of discovery would not spare Defendants any prejudice, but would prejudice Plaintiffs.

The only purported prejudice Defendants raise, besides being meritless, relates to trial, not discovery. As Plaintiffs have already noted, the City has made similar requests to bifurcate trial of the *Monell* claims from the § 1983 wrongful conviction claims in a number of similar suits, and every court to consider it has rejected that request. Plaintiffs contend the same result should apply here, for similar reasons. But the Court need only decide at this stage whether discovery will be bifurcated; if it denies the City’s motion, it may address the separate question of how to conduct the as-yet-scheduled trial at a later stage. Defendants do not even attempt to articulate any prejudice they would suffer from having discovery proceed on the *Monell* claims at this stage, and there is none.

On the other hand, the City asks the Court to commit now to bifurcating both discovery and trial, which “poses the difficulty of requiring two separate trials, with two separate juries, if

plaintiff prevails at the first trial on his claims against the individual defendants." *Masi v. City of New York*, No. 03-cv-0246, 2003 WL 22434132, at *1 (S.D.N.Y. Oct. 23, 2003). At least one court in this district has recognized that even where, "as a practical matter" a plaintiff "may choose not to pursue his *Monell* claim if he prevails at the first trial, … [i]t is inappropriate, however, to re-order discovery in such a way as to preclude preparation for plaintiff's cognizable *Monell* claim on the basis of such speculation." *Id.* Plaintiffs are the "master[s] of [their] complaint[s] and [have] chosen to pursue both individual and municipal liability claims. *Gibson*, 2021 WL 2127182, at *2.

And while the Court need not decide yet how to conduct the trial, the prejudice arguments Defendants make are also incorrect. The City claims that during the *Morant* trial Plaintiffs' counsel employed a trial strategy in which it sought punitive damages against one of the individual defendants in order to introduce evidence regarding that defendant's "poor character." ECF No. 120-1 at 10. That is flatly inaccurate; there was no "character" evidence introduced, in support of a claim for punitive damages or for any other reason. Nor was the damages award a "de facto punitive damages award" against this City; rather, it fairly recognized the enormity of the damages suffered by Mr. Morant.[8] There has been no showing that any evidence was introduced against individual defendants during the *Morant* trial was not properly admissible against the City. Notably, the City has not identified any specific evidence in this case, which involves different officer defendants, which it even posits would be admissible against the individual defendants but unfairly prejudicial to the City; even assuming hypothetically it could do so, as many courts have held, a limiting instruction would be an adequate response. *See Morant*, No. 22-cv-630, ECF No. 263 ("[T]he Court believes that it could mitigate the risk of prejudice to the individual Defendants

[8] The City's recent settlement with Horn and Jackson for $30.5 million, or nearly $1 million per year of wrongful incarceration each, belies any claim that Mr. Morant's damage award was improperly excessive.

with carefully-crafted jury instructions."); *see also James v. City of Los Angeles*, No. 21-cv-4525, 2024 WL 3467771, at *1 (C.D. Cal. Feb. 15, 2024) (denying the defendants' motion to bifurcate trial for individual liability under § 1983 and municipal liability because "any risk of prejudice can be cured by a limiting instructing"); *Schoolcraft v. City of New York*, 133 F. Supp. 3d 563, 571 (S.D.N.Y. 2015) (denying motion to bifurcate where "there will be significant overlap between the evidence" in support of individual liability and *Monell* claims and holding any prejudice from admission of evidence regarding "the blue wall of silence" can be mitigated through limiting instructions); *Williams v. City of Philadelphia*, No. 13-cv-207, 2014 WL 1632218, at *5 (E.D. Pa. Apr. 23, 2014) (declining to bifurcate a trial for individual and municipal liability claims, in part, because "[a]ny danger of juror confusion and unfair prejudice will be ameliorated by appropriate limiting instructions"); *D'Arrigo v. Gloucester City*, No. 04-cv-5967, 2007 WL 4440222, at *3 (D.N.J. Dec. 17, 2007).

Ultimately, it is Plaintiffs who will be prejudiced if *Monell* discovery were delayed, both because witnesses and evidence would be lost and because the ultimate resolution of the suit (and payment of any judgment) would be delayed, likely for additional years. Plaintiff Gould is already sixty-four years old. Two defendants in this case are already deceased, as is the Chief of Police at the time of the misconduct. *See Gibson*, 2021 WL 2127182, at *2 ("With memories fading and witnesses becoming unavailable as time passes, the Court finds that further delay would prejudice [plaintiff], who has already waited over thirty years to pursue his claims against the City."). The City should not be permitted to further delay resolution of Plaintiffs' over thirty-year nightmare.

**CONCLUSION**

For these reasons, this Court should deny the City's request to bifurcate and stay *Monell* discovery and to bifurcate the trial.

Respectfully submitted,

/s/ Grace Paras
Nick Brustin*
Emma Freudenberger*
Grace Paras*
Hayley Bork*
Neufeld Scheck Brustin Hoffmann &
Freudenberger, LLP
200 Varick Street, Suite 800
New York, NY 10014
(212) 965-9081

Richard Emanuel
Law Offices of Richard Emanuel
61 Grist Mill Circle
Guilford, CT 06437
(203) 710-3178

*Attorneys for Plaintiff George Gould*

*Attorneys admitted Pro Hac Vice

## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2026, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

*/s/ Grace Paras*