**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

GEORGE GOULD,

*Plaintiff*,

v.

CITY OF NEW HAVEN, ET AL.,

*Defendants*.

No. 3:25-cv-934 (KAD)

MARY MURPHY-TAYLOR,

*Plaintiff*,

v.

CITY OF NEW HAVEN, ET AL.,

*Defendants*.

No. 3:25-cv-935 (KAD)

September 30, 2026

# DEFENDANT CITY OF NEW HAVEN'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION TO BIFURCATE AND STAY DISCOVERY ON PLAINTIFFS' MONELL CLAIMS

## INTRODUCTION

Bifurcation is warranted both "[f]or convenience" and to "economize" discovery and "to avoid prejudice" at trial. Fed. R. Civ. P. 42(b). Plaintiffs' Response downplays—but does not deny—the degree to which judicial economy would be served by bifurcating and staying further *Monell* discovery, and sidesteps the potential prejudice that is likely if the claims are tried together. In short, they have not rebutted the City's argument that "the most prudent course is to address the *Monell* claims separately and to stay discovery concerning those claims until the liability of the individual defendants is established." D.E. 120-1 (quoting *Gavin v. City of New York*, 2021 WL 3774113, at *5 (S.D.N.Y. Aug. 24, 2021) (collecting cases)).[1]

## ARGUMENT

### I. Bifurcation would promote judicial economy in discovery.

Courts routinely bifurcate and stay *Monell* discovery pending the resolution of underlying constitutional claims because *Monell* discovery is extremely costly and time-consuming. *See, e.g.*, *Gavin*, 2021 WL 3774113, at *5. Plaintiffs do not dispute this, but maintain that judicial economy would not be served *here* because: (a) the City is estopped from contesting the *Monell* claims; (b) Plaintiffs' counsel have already developed significant *Monell* evidence; and (c) Plaintiffs are likely to prevail on their underlying claims. Each contention rests on a faulty premise, and none provides a basis for departing from "the most prudent course."

---

[1] Docket cites to Plaintiffs' opposition are to No. 3:25-cv-934.

### A. The City is not estopped from contesting Plaintiffs' *Monell* claims.

Plaintiffs first contend that bifurcating and staying *Monell* discovery would not serve judicial economy because the *Morant* jury already found that the City had a custom and practice of suppressing exculpatory evidence in the "early 1990s." *See* D.E. 127 at 7–8, 13–14. But no court has determined that the *Morant* jury's *Monell* verdict has preclusive effect, and Plaintiffs do not ask this Court to make that determination here.[2] In any event, Plaintiffs are wrong to suggest that collateral estoppel applies here, because the *Monell* issues in this case are not "identical in all respects with [those] decided in" *Morant*. *Faulkner v. Nat'l Geo. Enters.*, 409 F.3d 26, 37 (2d Cir. 2005).

The *Morant* jury found that "the City of New Haven had a widespread practice or custom of suppressing evidence that was favorable to criminal defendants." *Morant*, No. 3:22-cv-00630-SVN, D.E. 569 at 4. It made no finding regarding the contours of this policy, when it went into effect, or for how long it endured. The alleged suppression of exculpatory evidence in *Morant* took place in January 1991, when NHPD was investigating a 1990 double homicide; the suppression alleged here did not occur until July 1993. Because "[w]idespread policies do not necessarily persist indefinitely," the Court cannot conclude that the *Monell* issues in this case and in *Morant* are identical in all respects. *Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1063 (N.D. Ill. 2018) (finding of practice that existed between 1980 and 1986 did not

---

[2] Nor could the Court assign preclusive effect to the *Morant* verdict, since it has not been reduced to a "final judgment on the merits." *Bifolck v. Philip Morris USA*, 936 F.3d 74, 79–80 (2d Cir. 2019).

preclude defendant from contesting existence of practice between 1988 and 1990); *see also, e.g.*, *Preston v. City of Rochester*, 827 F. Supp. 3d 464, 471 (W.D.N.Y. 2026) (finding that 2018 training on dog encounters was constitutionally deficient did not estop defendant from contesting deficiency of 2019 training).

While Plaintiffs may contend that a widespread practice of suppressing favorable evidence continued in mid-1993 and thereafter, they will need to prove that contention in *this case*; the jury in *Morant* made no such finding. By the same token, the existence of a widespread policy of suppression *after* 1991 was not "actually litigated and actually decided" in *Morant*, nor "necessary to support a valid and final judgment on the merits." *Bifolck*, 936 F.3d at 79–80. Plaintiffs thus cannot satisfy their burden of establishing the elements of offensive collateral estoppel.

### B. Considerable *Monell* discovery remains in this case, notwithstanding the evidence developed in *Morant*.

Plaintiffs next argue that judicial economy would not be served by bifurcating and staying *Monell* discovery because their counsel have already "developed the bulk of the *Monell* evidence that [they] will use" here, through discovery in the *Morant* case. *See* D.E. 127 at 8–12. While Plaintiffs are within their rights to "seek only minimal supplementation of the *Monell* evidence already collected from the *Morant* litigation," *id.* at 12, the City has no such intention.

To complete *Monell* discovery, the City will, at a minimum, retain and disclose a new police-practices expert, depose Plaintiffs' expert, and obtain statements from as many former NHPD detectives as possible concerning their understanding of NHPD policies and practices. This necessary defensive discovery will be costly and

burdensome not only for the City, but also for Plaintiffs and the individual defendants as well (assuming they would want to depose any newly disclosed experts or fact witnesses). Plaintiffs do not dispute that this discovery is permissible; they just think it would be more efficient to rely on the evidence already presented in *Morant*. *See* D.E. 127 at 12–13. For obvious reasons, the City does not share this assessment.[3]

**C. Resolution of the underlying claims will likely moot the *Monell* claims.**

Bifurcation is appropriate in *Monell* cases because "the litigation of the first issue"—whether an officer violated the plaintiff's constitutional rights—"might eliminate the need to litigate the second issue"—whether the violation was caused by a municipal policy or practice. *Amato v. City of Saratoga Springs*, 170 F.3d 311, 316 (2d Cir. 1999). Notwithstanding Plaintiffs' prediction, that remains likely here.

**1. Plaintiffs are not assured of success on the underlying claims.**

To begin with, the underlying constitutional claims face steeper odds than Plaintiffs let on. D.E. 127 at 3. Their core allegation is that Defendant Sullivan coerced a witness, Doreen Stiles, to implicate them in the murder of Eugenio Vega by detaining her for hours while she was experiencing heroin withdrawal and only permitting her to "leave and get her fix" if she "t[old] the officers what they wanted

[3] Plaintiffs' reliance on recent orders denying motions to bifurcate in other *Monell* cases involving the City is misguided. *See* D.E. 127 at 3 n.1. In each of those cases, the motion to bifurcate was raised on the eve of trial, after *Monell* discovery had already closed. Indeed, in *Horn* and *Jackson*, the Court denied the motion for bifurcation "but without prejudice because I do agree that when I have a more developed sense of what the trial will look like, I may have a very different view." *Horn*, No. 3:19-cv-388-KAD, D.E. 334 at 43:2–4. But whether to stay *Monell* discovery before its costs are incurred is a different question from how to structure a trial. *See, e.g.*, *Dixon v. City of Buffalo*, 2022 WL 22834228, at *5 (W.D.N.Y. Mar. 8, 2022) (noting that "[b]ifurcation of the *Monell* claims for trial is a distinct issue to be resolved" and staying *Monell* discovery in wrongful conviction case).

to hear." D.E. 127 at 3. Their claim thus turns on the credibility of Ms. Stiles, who has proved to be an unreliable witness.

By her own admission, Ms. Stiles has changed her story at least five times. She has stated that, when she was first interviewed by NHPD detectives Dease and Gethers shortly after the July 1993 homicide, she "denied that [she] had any information" and told them, "I wasn't there." *See* Ex. 1, 10/14/93 Probable Cause Tr. at 39 ("Q: You still denied that you had any information even after he questioned you about it? A: Yes, yes."); Ex. 2, 1/19/95 Trial Tr. at 62 ("A: I just said I didn't know anything. … I didn't say I was any place else. I just said I wasn't there."). Within hours, however, she told officers that she could identify one of the men, whom she saw at the scene. *See* Ex. 3, 7/29/93 Statement. At a probable-cause hearing a few months later (and again at trial in January 1995), she testified that she saw both Gould and Taylor at the scene and that she overheard a verbal altercation followed by gunshots. *See* Ex. 1, 10/14/93 Probable Cause Tr. at 57–64; Ex. 2, 1/19/95 Trial Tr. at 63–64. The jury credited this testimony even though Ms. Stiles acknowledged that she had initially told police she wasn't even at the scene.

In 2006, Ms. Stiles changed her story again. Gerald O'Donnell, an investigator hired by Mr. Taylor's family, obtained a statement from Ms. Stiles denying that she had witnessed the murder and claiming that her earlier statements had been coerced. *See* Ex. 4, O'Donnell Interview Tr. at 7–9. It later emerged, however, that O'Donnell bought her gifts and suggested she might receive money in the future if she recanted. *See* Ex. 5, *State v. O'Donnell* Trial Tr. at 81–82. Ms. Stiles proceeded to testify at

Plaintiffs' 2009 habeas trial that she did not witness the murder, and the state habeas court relied on her testimony in granting Plaintiffs' petition and ordering them released. *Gould v. Comm'r of Corr.*, 2010 WL 1544667, at *1 (Conn. Super. Ct. Mar. 17, 2010) ("This case rises and falls on the testimony of Doreen Stiles.").[4] Plaintiffs continue to rely on this iteration of Ms. Stiles's story—but it was not the final version.

Following the habeas trial, NHPD detectives asked Ms. Stiles why she changed her testimony. In a statement recorded on video (without any indication of coercion), Ms. Stiles explained that she really *had* witnessed the homicide but felt bad for Plaintiffs and was pressured by O'Donnell to recant. *See* Ex. 6, Stiles Interview Tr. at 5–6, 13; Ex. 7 (Video Recording). But when O'Donnell was prosecuted for witness tampering in 2013, Ms. Stiles flipped yet again, testifying that she did not witness the homicide (though acknowledging that O'Donnell had given her a TV, stereo, food, and money). *See* Ex. 5, *State v. O'Donnell* Trial Tr. at 54–57. Ms. Stiles again stated that she had not witnessed the homicide when interviewed by the FBI in December 2017. *See* Ex. 9, 12/8/17 FBI FD-302. But in December 2023, she changed her story for (at least) the fifth time, telling the Conviction Integrity Unit that she did see Plaintiffs on the day of the murder and "did see it." Ex. 10, CIU Report.

Given Ms. Stiles's lengthy history of inconsistent statements, the State's Attorney concluded that her trial testimony could not be relied upon and that

---

4 The Supreme Court reversed the 2010 habeas decision, holding that Judge Fuger applied the incorrect standard for claims of actual innocence. *See Gould v. Comm'r of Corr.*, 301 Conn. 544 (2011). A second habeas trial was held in 2012, but Ms. Stiles refused to testify, invoking her Fifth Amendment right against self-incrimination. *See* Ex. 8, Habeas Trial Tr. at 6.

Plaintiffs' convictions should therefore be vacated. By the same token, however, Ms. Stiles's other contradictory statements cannot be relied upon either, including her assertion that Detective Sullivan coerced her to implicate Plaintiffs while she was in withdrawal and took her to purchase heroin only after she told him "what [he] wanted to hear." Even if Ms. Stiles testifies at trial and reverts to the story she told the habeas court (no sure thing), it is unlikely that a jury would find her credible.

To be sure, Plaintiffs maintain that Defendant Sullivan has already admitted to some of what Ms. Stiles once claimed. *See* D.E. 127 at 4, 9. But even if Sullivan admits to some of the conduct alleged, Plaintiffs must still show that the evidence he suppressed was material, meaning that, "had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). Considering that the jury in Plaintiffs' criminal trial *was* made aware of much of this information (including Ms. Stiles's initial denial of knowledge, the length of her interrogation, and the fact that she was going through heroin withdrawal, *see* Ex. 11, 1/30/95 Trial Tr. at 53–71), it will be difficult for Plaintiffs to establish that any additional details would have changed the result.

In short, the odds of Plaintiffs prevailing on their underlying claims are not so great that trial on the *Monell* claims is guaranteed. On the contrary, it is entirely possible that "litigation of the first issue might eliminate the need to litigate the second issue," making bifurcation "appropriate." *Amato*, 170 F.3d at 316.[5]

---

[5] Plaintiffs contend that a defense verdict on the underlying claims would not necessarily moot the *Monell* claim, because "municipal liability for constitutional injuries may be found to exist even in the absence of individual liability." D.E. 127 at 16 (quoting *Barrett v. Orange Cnty. Hum. Rts. Comm'n*, 194 F.3d 341, 350 (2d Cir.

### 2. If Plaintiffs succeed, the *Monell* claims may still become moot.

Even if Plaintiffs prevail on their underlying claims, that does not mean the *Monell* claims must be tried. Plaintiffs acknowledge the possibility that the City could be required to indemnify the individual defendants, but maintain that the *Monell* claim would still be necessary in order for them to recover attorneys' fees. D.E. 127 at 14.[6] In reality, of course, the parties would hardly recommence *Monell* discovery and conduct a separate trial on the *Monell* claims just to determine whether Plaintiffs are prevailing parties under 42 U.S.C. § 1988. Instead, in this scenario, the parties would almost certainly resolve the remaining issues through settlement.

In fact, settlement—and not a *Monell* trial or indemnification—is the most likely resolution any time a plaintiff prevails on his underlying constitutional claims in a bifurcated case. *See, e.g.*, *Padilla v. City of New York*, 1993 WL 5833, at *1 (S.D.N.Y. Jan. 4, 1993) ("If the verdict is in favor of the individual defendants, that ends the case; if the verdict is in favor of plaintiff, the City has a substantial incentive to settle the case."). Contrary to Plaintiffs' conclusory assertion that "the City of New York almost invariably indemnifies its officers for constitutional violations," D.E. 127 at 15, New York law in fact provides that there is no duty to indemnify "where the injury or damage resulted from intentional wrongdoing or recklessness on the part of

---

1999). But that is possible only when "the injuries complained of are not solely attributable to the actions of named individual defendants." *Id.* That is simply not the case where, as here, all of Plaintiffs' alleged injuries are attributed to the actions of named defendants. If *these* defendants did not violate Plaintiffs' rights, then Plaintiffs' rights were not violated.

[6] Plaintiffs fault the City for not affirmatively representing that it will indemnify the individual defendants, *id.*, but that obligation is dictated by state law. *See generally* Conn. Gen. Stat. §§ 7-101a, 7-465.

the employee." N.Y. Gen. Mun. L. § 50-k(3); *compare* Conn. Gen. Stat. §§ 7-101a, 7-465. It is thus far more likely that the City of New York invariably *settles* claims when a constitutional violation is found. *See DaCosta v. Tranchina*, 285 F. Supp. 3d 566, 575 (E.D.N.Y. 2018) ("The invariable practice seems to be for the City—should an officer be held liable by the jury—to pay the judgment."). That potential outcome is equally possible in Connecticut and would equally moot the *Monell* claims.

## II. Bifurcation would avoid prejudice at trial.

Plaintiffs fail to confront the prejudice Defendants may face in a unified trial, while overstating the prejudice they will face if the claims are bifurcated. The most obvious prejudice that will result if the claims are not bifurcated is to the individual defendants, one of whom has now joined the City's motion. *See, e.g.*, *Anthony v. City of Bridgeport*, 2015 WL 3745302, at *2 (D. Conn. Jun. 15, 2015) ("The type of evidence that Plaintiff would have to present in order to prevail on his *Monell* claims … could create undue prejudice against [the officer]."). Yet Plaintiffs do not address this risk at all. Nor do Plaintiffs address the risk that presenting both individual and *Monell* claims in the same trial could cause jury confusion. *See Bradford v. City of Chicago*, 2019 WL 5208852, at *4 (N.D. Ill. Oct. 16, 2019) ("[A] combined trial in which the jury is asked to weigh evidence of both individual employee misconduct and City policy risks that *Monell* would devolve into a *respondeat superior* claim, a risk easily avoidable by bifurcating the *Monell* claim.").

Instead, Plaintiffs challenge the City's reference to *Morant* as an *illustration* of the type of prejudice that might result from failing to bifurcate. *See* D.E. 127 at 18. Their assertion that no "character" evidence was introduced in *Morant* is incorrect.

*See, e.g.*, Ex. 12, Excerpts *Morant* Trial Tr., D.E. 582, at 96 (allowing witness to agree with counsel's characterization of Raucci as "a crooked cop"); *id.*, D.E. 590 at 119 (allowing witness to call Raucci "a dirty cop"); *id.*, D.E. 584, at 91–92 (allowing witness to testify about Raucci's criminal activity and drug-dealing as Rule 404(b) evidence, despite irrelevance to the *Monell* claim); *id.,* D.E. 590 at 95–98 (allowing witness to describe how Raucci proposed planting cocaine in a suspect's car as 404(b) evidence); *id.*, D.E. 595 at 119–20, D.E. 596 at 4–5 (allowing plaintiff's counsel to ask Raucci about a sexual relationship with the victim in a rape investigation he was conducting). Regardless, *Morant* plainly illustrates the *risk* that the City could be tainted by negative evidence that would only be admissible against the individual defendants, and that the individual defendants in turn could be prejudiced by *Monell* evidence. Bifurcation avoids that risk, as well as the risk of jury confusion. *See Ricciuti v. N.Y.C. Transit Auth.*, 796 F. Supp. 84, 86 (S.D.N.Y. 1992).

By contrast, the only "prejudice" Plaintiffs would suffer from bifurcation is potential delay. *See* D.E. 127 at 19. Yet, in all likelihood, the resolution of the underlying claims will *moot* the *Monell* claims, not delay them. *See supra* at 8–9. Moreover, any concern that witnesses and evidence could be lost is unfounded, given that discovery on the underlying claims would proceed (including discovery that relates both to the underlying claims and the *Monell* claims). On balance, then, bifurcation is the most prudent way to avoid undue prejudice.

**CONCLUSION**

For the foregoing reasons, and those set forth in the City's initial memorandum, the motion to bifurcate should be granted.

Respectfully submitted,

/s/ *Tadhg Dooley*
Tadhg Dooley (ct29364)
Daniel Passeser (ct32099)
Armando Ghinaglia (ct31859)
Wiggin and Dana LLP
One Century Tower
265 Church Street
New Haven, CT 06510
(203) 498-4400
tdooley@wiggin.com

*Counsel for Defendant City of New Haven*